UNITED STATES DISTRICT COURT
EASTERN DISTRICT of LOUISIANA
NEW ORLEANS DIVISION

Rondy Vernon,Sr.,Petitioner

Versus

N.Burl Cain,Warden
La.State Penitentiary,Respondent

CIVIL ACTION No.:_____

FILED:_____

_____
Deputy Clerk:

## I. STATEMENT OF JURISDICTION

Under 28 U.S.C.,Section 2241,Federal Courts have jurisdiction
to entertain a State prisoner's Habeas Corpus Petition if his con-
finement is the result of a violation of Federal Law.Further, jur-
isdiction arises under 28 U.S.C. 2254(a); Federal Judges shall
entertain Habeas Corpus Application "on behalf of a person in cust-
ody pursuant to the judgment of a State Court on the ground that
he is in custody in violation of the Constitution or Laws and Tre-
aties of the United States".

Now, this Petition is respectfully filed into the United States
District Court for the District which has jurisdictional authority
over Petitioner's indictment,trial,unlawfully conviction and sent-
ence.

## 2. PROCEDURAL HISTORY OF CASE

On January 23,1997, the Grand Jury for the Parish of Washington
indicted Petitioner(Rondy Vernon,Sr.) for the crime of First-Degree
Murder, in violation of Louisiana Revised Statute 14:30(A).(1);by
murdering Edna McCain in the First Degree.

The Second Indictment read in pertinent part: by the grand jury
Petitioner violated the La.R.S. 14:64, by committing Armed Robbery
of Edna McCain while armed with a damagerous weapon,to wit:Knife.

Petitioner violated La.R.S. 14:44.1 Second Degree Kidnapping by
forcible seizing and carrying Edna McCain in order to facilitate
the commission of a felony and physically injuring her and keeping
her imprisoned while leading the victim to reasonably believe the
offender is armed with a damagerous weapon.

Prior to trial, on or about March 5th,2001, and without object-

-1-

ion from defense counsels, the State amended the indictment to Second Degree Murder, in violation of La.R.S. 14:30.1

A trial by jury was held in this matter on March 5th-9th, 2001, as the jury returned a unanimous verdict of guilty as charged. Subsequently, the petitioner was sentenced to LIFE imprisonment without the benefit of parole,probation and suspension of sentence.

Ms.Holli Herrle-Castillo, Attorney-At-Law for the Louisiana Appellate Project, was appointed to represent Petitioner on appeal. The Appeal's Court affirmed Petitioner's conviction and sentence on September 30,2002, see Appeal of State v. Rondy Vernon, District Court #97-CR- 467763, Appeal #2001-KA-2104. Petitioner, timely sought a Writ of Certiorari to the Louisiana Supreme Court Writ were Denied under docket no.:200-KO-3011,on September 19,2003. Case citing 853 So.2d 632;2003 La.Lexis 2519 No.2002-KO-3011,09/ 19/03.

Immediately, after Petitioner conviction became final by the S.Ct. of La., Petitioner filed for his District Attorney's Files to the trial court and the Honorable Judge Coady Granted Petitioner his files on November 24,2003. On January 22,2004, Petitioner filed a Motion To Compel, the District Attorney to comply with the Courts Order and the trial judge Granted again the petitioner his D.A.'s Files. On July 1st,2004, Petitioner went before the trial judge in this matter concerning the Motion For A Contradictiary Hearing filed by Petitioner and again the trial judge granted petitioner his District Attorney Files .Now, due to the A.E.D.P.A. limitation, Petitioner was forced to file a Application for Post Conviction Relief which was no more than a "Skeleton/Shell Brief for his P.C.R.A., assigning six(6) assignments of errors, on August 30,2004.

While waiting on the trial court ruling, Petitioner filed a Supplement to his pending Application for Post Conviction Relief on June 23,2005. However, Petitioner did not receive notice of the trial court rulings on both briefs until August 19,2005.The

P.C.R. Brief, was ruled as <u>MOOT</u>, and the Supplemental Brief <u>Denied.</u>
Petitioner requested the Hearing transcripts on July 1st,2004, to the Clerk of Court yet to this date and year no transcripts have not been mailed to Petitioner.

In additional, due to Hurricane Kitrina and Rita Petitioner was delayed in filing his Writ of Refiew caused by the hurricanes in the Southeastern and Southwestern Parishes. Plus, the mail-room here at the institution misplaced Petitioner legal papers to be copied at the legal program department, during this time as well.

On October 27,2005, Petitioner filed a Motion To Compel to the District Court, asking the court to make a ruling on his Post Con-wiction Relief and Memorandum of Law in support of his pending A. for P.C.R., the trial court denied this motion.

On November 11,2005, Petitioner filed to the First Circuit Court of Appeals, an Motion For Extention of Time and A Motion For to Exceed Page Limitation. These motions was granted and denied. Under docket no.:<u>2006-KW-1063</u>, the 1st Cir.C. of App. Denied Petit-ioner's Writ of Review.On September 14,2007, the La.S.Ct. Denied Petitioner's Writ of Certiorari under docket no.: <u>2006-KH-2766.</u>

Furthermore, since Petitioner never filed a proper filed App-lication for Post Conviction Relief in behalf of attacking his State's Conviction, Petitioner is asking This Honorable Court that has jurisdictional authority to Grant Petitioner the opportunity to file a proper Application for Post Conviction Relief, on Affirming Honorable Judge Coady's three(3) rulings concerning Petitioner's District Attorney's Files and to allow Petitioner to add one(1) other assignment of error to his P.C.R. Brief.

Petitioner now seeks a Writ of Habeas Corpus from this Honor-able Court, where he contends that the lower State Courts denied of relief and clearly a violation of Due Process of Law under the Constitutional provisions of both Louisiana and United States Con-stitutions.

# The Supreme Court of the State of Louisiana

STATE EX REL. RONDY VERNON

VS.                                                    NO.  2006-KH-2766

STATE OF LOUISIANA

– – – – – –

IN RE:  Vernon, Rondy; - Plaintiff; Applying for Supervisory and/or
Remedial Writs, Parish of Washington,  22nd Judicial District Court
Div. F, Nos. 97-CR-467763; to the Court of Appeal, First Circuit, No.
2006 KW 1063

– – – – – –

**September 14, 2007**

Denied.

                                    CDK

                                    PFC

                                    BJJ

                                    CDT

                                    JTK

WEIMER, J.,  recused.

Supreme Court of Louisiana
September 14, 2007

*Katherine A. Fontana*
Deputy    Clerk of Court
          For the Court



Office Of The Clerk
## Court of Appeal, First Circuit
State of Louisiana
www.la-fcca.org

Christine L. Crow
Clerk of Court

Post Office Box 4408
Baton Rouge, LA
70821-4408
(225) 382-3000

**Certificate of Mailing**
8/21/2006

2006-KW-1063

State Of Louisiana
Versus
Rondy Vernon

TO:    Hon. Martin E. Coady          Hon. Walter P. Reed
       701 North Columbia Street      Washington Parish
       Room 3006                      905 Pearl St.
       Covington, LA 70433            Franklinton, LA 70438
       Rondy  Vernon Sr.
       Camp "C" Wolf -2  Dorm
       Louisiana State Penitentiary
       Angola, LA 70712

   I hereby certify that a copy of the attached was mailed this date to the trial judge, all counsel of record, and all parties not represented by counsel as listed above.

CHRISTINE L. CROW
CLERK OF COURT

# STATE OF LOUISIANA

# COURT OF APPEAL, FIRST CIRCUIT

STATE OF LOUISIANA

NUMBER 2006 KW 1063

VERSUS

RONDY VERNON

AUGUST 21, 2006

In Re:     Rondy Vernon, applying for supervisory writs,
           22nd Judicial District Court, Parish of
           Washington, No. 97-CR-467763.

**BEFORE:   KUHN, GAIDRY, AND WELCH, JJ.**

**WRIT DENIED.**    Relator's claims cannot be reviewed
because relator failed to comply with the action handed
down by this Court in 2005 KW 2727.

**JEK**
**EJG**
**JEW**

COURT OF APPEAL, FIRST CIRCUIT

DEPUTY CLERK OF COURT
FOR THE COURT

*Application for Supervisory and/or Remedial Writs, No. 2005 Kw 2737*

INMATE'S REQUEST FOR LEGAL/INDIGENT MAIL

NAME: _Rondy Vernon, Sr._

NUMBER: _93669_

LOCATION: _Wolf - 2_

BALANCE IN YOUR DRAWING ACCOUNT: $ _____

LIST EACH ITEM TO BE MAILED
GIVE THE NAME AND COMPLETE ADDRESS OF EACH
PIECE TO BE MAILED:

_Hon. Martin E. Coady_
name
_701 N. Columbia Street_
address
_Covington, Louisiana  70433_
city, state, zip code

_Hon. Walter P. Reed, Justice Center_
name
_701 N. Columbia Street_
address
_Covington, Louisiana  70433_
city, state, zip code

_First Circuit Court of Appeal_
name
_P.O. Box 4408_
address
_Baton Rouge, Louisiana  70821-4408_
city, state, zip code

ANY DELIBERATE MISREPRESENTATION WILL RESULT
IN YOUR MAIL BEING RETURNED

_Rondy Vernon, Sr. #93669_
inmate's signature and number

_Orwin Mercer    05/19/06_
classification officer    date



Office Of The Clerk

# Court of Appeal, First Circuit
State of Louisiana
www.la-fcca.org

Christine L. Crow
Clerk of Court

Post Office Box 4408
Baton Rouge, LA
70821-4408
(225) 382-3000

**Certificate of Mailing**
3/27/2006

2005-KW-2727

State Of Louisiana
Versus
Rondy Vernon, Sr.

TO:    Hon. Martin E. Coady          Hon. Walter P. Reed
       701 North Columbia Street     Washington Parish
       Room 3006                     905 Pearl St.
       Covington, LA 70433           Franklinton, LA 70438

       Rondy Vernon Sr.
       Camp "C" Wolf -2 Dorm
       Louisiana State Penitentiary
       Angola, LA 70712

I hereby certify that a copy of the attached was mailed this date to the trial judge, all counsel of record, and all parties not represented by counsel as listed above.

*Elizabeth D. Nauta*

CHRISTINE L. CROW
CLERK OF COURT

# STATE OF LOUISIANA

# COURT OF APPEAL, FIRST CIRCUIT

STATE OF LOUISIANA                    NUMBER 2005 KW 2727

VERSUS

RONDY VERNON                          MARCH 27, 2006

---

In Re:    Rondy Vernon, applying for supervisory writs, 22nd Judicial District Court, Parish of Washington, No. 97-CR-467763.

---

**BEFORE: WHIPPLE, McCLENDON, AND WELCH, JJ.**

**MOTION FOR EXTENSION OF TIME IN WHICH TO FILE WRIT APPLICATION GRANTED. MOTION TO EXCEED PAGE LIMITATION DENIED. WRIT DENIED ON THE SHOWING MADE.** Although much latitude is given to writ applications filed by pro se prisoners, this Court declines to grant the request for leave to exceed the page limits. See Uniform Rules—Courts of Appeal, Rules 4-5 (e) & 2-12.2.

Relator failed to include the state's answer, if any, the trial court's ruling on the application for post conviction relief, a complete copy of the transcript of the proceedings, and any other portions of the district court record that might support the claims raised in the application for post conviction relief. Supplementation of this writ application and/or an application for rehearing will not be considered. See Uniform Rules—Courts of Appeal, Rules 2-18.7 & 4-9. Any future filing on this issue should include the entire contents of this application, the missing items noted above, and a copy of this ruling. In the event relator elects to file a new application with this Court, the application must be filed on or before May 22, 2006.

PMc
JEW
VGW

COURT OF APPEAL, FIRST CIRCUIT

_Elizabeth D. Jauta_

DEPUTY CLERK OF COURT
FOR THE COURT

INMATE'S REQUEST FOR LEGAL/INDIGENT MAIL

NAME: _Rondy Vernon_

NUMBER: _93669_

LOCATION: _Camp C Wolf 3_

BALANCE IN YOUR DRAWING ACCOUNT: $ _____

LIST EACH ITEM TO BE MAILED
GIVE THE NAME AND COMPLETE ADDRESS OF EACH
PIECE TO BE MAILED:

① _Hon. Johnny D. Crain, Clerk_
_22nd JDC, Parish of Washington_
name
_P.O. Box 607_
address
_Franklinton, LA 70438-0607_
city, state, zip code

② _Hon. Johnny D. Crain Clerk_
_22nd JDC, Parish of Washington_
name
_P.O. Box 607_
address
_Franklinton, LA 70438-0607_
city, state, zip code

③ _Hon. Johnny D. Crain, Clerk_
_22nd JDC, Parish of Washington_
name
_P.O. Box 607_
address
_Franklinton, LA 70438-0607_
city, state, zip code

ANY DELIBERATE MISREPRESENTATION WILL RESULT
IN YOUR MAIL BEING RETURNED

_Rondy Vernon Jr. #93669_
inmate's signature and number

_Irvin Marcantel_   _6/17/05_
classification officer      date

① Supplemental Memorandum of Law in Support of Uniform Application for Post Conviction Relief, 22nd JDC, Parish of Washington, No. 97-CR-46776-3 "F"
② Transcript Exhibits ③ Exhibits



**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clerk of Court /22 Judicial
Dist Court

P.O. Box 607
FRANKLINTON, LA
70438

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Gavin Mccain_          ☐ Agent
                          ☐ Addressee

B. Received by ( Printed Name)     C. Date of Delivery

Gavin Mccarn

D. Is delivery address different          ☐ Yes
   If YES, enter delivery                 ☐ No

3. Service Type
☒ Certified Mail      ☐ Express Mail
☐ Registered         ☒ Return Receipt for Merchandise
☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)      ☐ Yes

2. Article Number
   (Transfer from service label)      7004 0550 0000 7390 5795

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

# The Supreme Court of the State of Louisiana

STATE OF LOUISIANA

VS.                                                    NO.  2002-KO-3011

RONDY VERNON, SR.

- - - - -

IN RE:  Vernon, Rondy Sr.; - Defendant; Applying for Writ of
Certiorari and/or Review, Parish of Washington,  22nd Judicial
District Court Div. F, Nos. 97CR467763; to the Court of Appeal, First
Circuit, No. 2001 KA 2104

- - - - - -

September 19, 2003

Denied.

CDK

PFC

BJJ

JPV

CDT

JTK

JLW

Supreme Court of Louisiana
September 19, 2003

Deputy
Clerk of Court
For the Court

# LOUISIANA APPELLATE PROJECT
## Providing appellate defense in felony cases

September 30, 2002

Mr. Rondy Vernon, Sr.
DOC # 93669
Camp C Wolf 3 Dorm
Louisiana State Penitentiary
Angola, LA 70712-9813

James H. Looney
Executive Director
P. O. Box 3340
Covington, LA 70434-3340
Phone: (985) 892-1707
Fax: (985) 892-9377

Gwendolyn K. Brown
Regions 1 & 5 Supervisor
P. O. Box 64962
Baton Rouge, LA 70896-4962
Voice & Fax: (225) 922-9570

Holli Herrle-Castillo
Appellate Counsel
P. O. Box 2333
Marrero, LA 70073-2333
Voice & Fax: (504) 371-8279

RE:   Appeal of State v. Rondy Vernon
      District Court # 97 CR4 67763
      Appeal # 2001-KA-2104.

Dear Mr. Vernon:

We have received the decision of the Court of Appeal. Unfortunately it is not good news. The Court of Appeal affirmed or let stand your conviction and sentence. A copy of that decision is enclosed for your records. You were previously sent the brief filed on your behalf.

You can file an application for writs to the Louisiana Supreme Court. We will not do so. Indeed, this action by the appellate court ends our work on your behalf. It is our considered professional opinion that such an application would not be granted, based on the consideration of the Supreme Court rules. If you choose to file such an application, you will have to file it within thirty (30) days of the date on the decision. You may wish to retain an attorney to handle this application, although it is permissible for you to file such application pro se.

We would call to your attention the provisions of C.Cr.P., Art. 930.8 which require that any application for post conviction relief be filed within two (2) years of the final judgment by the appellate court on your appeal. Such applications must be submitted on the forms available at the prison.

Federal law mandates that any habeas corpus proceeding filed to contest the conviction be filed within one (1) year of the final decision on appeal, excluding the time any State post conviction relief application is pending, so this is a shorter and serious deadline.

Post conviction and habeas applications are not something handled by the Louisiana Appellate Project. So we are offering no evaluation of your case for these types of claims – not suggesting that you should or should not file

Mr. Vernon
September 30, 2002

Page 2

an application.  If you decide to explore this possibility, your choices are to handle the matter yourself, seek the assistance of inmate counsel, or retain an attorney.

Time is important, if you wish to make any further attack on your conviction since you will be barred if these deadlines are not met.  I wish you good luck on all of your future endeavors.

Sincerely,

Holli Herrle-Castillo

Encl.

To: United States District Court
    Eastern District of Louisiana

From:  Rondy Vernon, Sr., #93669
       Camp C Wolf-2 Dormitory
       Louisiana State Penitentiary
       Angola, Louisiana 70712

Date:  10/05/07
Re:  Petitioner is informing this Court on extra exhibits will
     be mailed as soon as received from the Legal Programs Dept.
     in support of Petitioner's Claims:

To Whom it May Concern:
     Petitioner will be late on extra exhibits in support of his
Federal Habeas Corpus Petition and he is asking this Court to
please file with Petitioner's other copies of exhibits in his be-
half.

                                        Sincerely:

                                        Rondy Vernon, Sr.

                                        Rondy Vernon, Sr.


TENDERED FOR FILING

OCT 1 1 2007

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

cc

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


CASE NUMBER _____


RONDY VERNON, Sr.
(PETITIONER)

-VERSUS-

BURL CAIN, WARDEN
La. STATE PRISON
(RESPONDENT)


************************************************************

MEMORANDUM IN SUPPORT OF

WRIT OF HABEAS CORPUS

************************************************************


Respectfully Submitted:
Rondy Vernon, Sr., #93669

Camp C Wolf-2 Dormitory
La. State Penitentiary
Angola, Louisiana 70712
In Forma Pauperis and pro se

TENDERED FOR FILING

OCT 11 2007

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

## FOOTNOTES

_____

1. Exhibit 1-A . . . . p.10 Minute Entrance DNA
2. See Ms.Payne's notarized statement in record.(p.11, Appellant counsel brief, Ms.Holli Herrle-Castillo).
3. Tr.T.Vol. 3,p.149 and 150
4. Tr.T.Vol. 4,p.163
5. Exhibit R; Tr.T.Vol.4,p.91
6. Ante at p.1 and 2 of appellant brief
7. Exhibits D and X1
8. Tr.T.Vol.4,p.115
9. Tr.T.Vol.4,p.110
10. Tr.T.Vol.3,p.72; Exhibit D.
11. Tr.T.Vol.4,p.175 and 203
12. Tr.T.Vol.4,p.211
13. Tr.T.Vol.4,p.173
14. Ante at p.1 and Exhibit A.
15. Ante at Exhibit A. and D.
16. Tr.T.Vol.2,p.35 and 36
17. Exhibit K.
18. Exhibit G. and H.
19. Exhibit L.
20. Exhibit M.
21. Tr.T.Vol.2,p.4; Exhibit N.
22. Tr.T.Vol.4,p.63
23. Tr.T.Vol.3,p.73
24. Tr.T.Vol.4,p.159 and Exhibit X1.
25. Tr.T.Vol.4,p.122
26. Tr.T.Vol.4,p.144,147,149-152,156-61,163; and Exhibits Z & X1, Y,A1,B1,W.
27. Tr.T.Vol.4,p.149
28. Tr.T.Vol.4,p.122
29. Tr.T.Vol.2,p.146
30. Tr.T.Vol.4,p.162
31. Tr.T.Vol.2,p.79

## FOOTNOTES

32. Tr.T.Vol.2,p.88;131, and 141; Exhibit T.
33. Tr.T.Vol.2,p.76
34. Tr.T.Vol.2,p.102 and 140
35. Exhibits C1; Y,A1,W
36. Tr.T.Vol.3,p.35 and 36; Tr.T.Vol.4,p.123
37. Tr.T.Vol.3,p.92
38. Exhibit D1.
39. Tr.T.Vol.3,p.92
40. Tr.T.Vol.3,p.141,142
41. Tr.T.Vol.3,p.149
42. Tr.T.Vol.3,p.151
43. Tr.T.Vol.3,p.155
44. Exhibit D1.
45. Tr.T.Vol.2,p.36
46. Tr.T.Vol.2,p.22,23
47. Ante at p.22 and 23
47. Tr.T.Vol.1,p.186
48. Tr.T.Vol.2,p.73;83
49. Tr.T.Vol.2,p.73;76
50. Tr.T.Vol.2,p.76;77
51. Tr.T.Vol.4,p.91
52. Tr.T.Vol.2,p.127
53. Tr.T.Vol.2,p.123
54. Exhibit U.
55. Exhibit R.

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


CIVIL ACTION:

Rondy Vernon,Sr.                    CASE No.:_____
Versus                              FILED:_____
BURL CAIN,WARDEN                    /S/:_____

-------------------------------------------------------------

MEMORANDUM IN SUPPORT OF
WRIT OF HABEAS CORPUS

-------------------------------------------------------------

Rondy Vernon,Sr., Petitioner herein, an inmate of the
Louisiana State Penitentiary, submits this memorandum in sup-
port of his Writ of Habeas Corpus pursuant to 28 U.S.C.,Sec-
tion 2254.

In this memorandum, Petitioner submits three(3) grounds
for relief: 1)Violation of the 14th Amendment Due Process to
the United States Constitution, when the government failed
to produce a significant portion of the transcript for appel-
late review: (2) Violation of the 14th Amend. Due Process to
the U.S. Const., when the district court lack subject matter
jurisdiction to try the offense;(3) Violation of the 6th Am-
end. Counsel Clause of the U.S. Const., where trial counsel's
performance was deficient and prejudicial to Petition.


I. STATEMENT of THE FACTS


On December 7,1996, Edna McCain of Franklinton,Louisiana,
was found dead in the trunk of her car in El Paso,Texas.R.p.
1029. The cause of death was hypothermia.R.p.815. Edna McCain

-1-

had been missing since December 4,1996, when she failed to
come home from her job at K & S, a local convenience store/
gas station. Ms.McCain's boyfriend, Vernon Jenkins, made the
initial call to the police some hours after McCain was due
home. R.p.847.

Officer Mark Bott, a patrolman with the Franklinton Police
arrived at the gas station on 12/04/96, and observed that the
building was locked up and there were no cars in the parking lot.
R.p.851. Bott left the area and was summoned back by Deputy Billy
Jones, who had found a knife in the parking lot.R.p.857. Jones
put the knife in a cardboard paper towel tube in the trunk of his
car. R.p.857. The two deputies then got another employee of the
station who had keys to the building to open the station, and fo-
und that everything was in order. The night deposit, which was
McCain's responsibility, was not in the station.R.p.862. The de-
puties then called out the manager of the Hancock bank, where
the night deposit should have been dropped off and determined
the money had not been deposit. R.p. 863. At this point, the dep-
uties called in the department detectives and cordoned off the
station as a crime scene. They also placed the knife back on the
ground and photographed it at this time.R.p.863.

Deputy Jones gave the knife, which he had placed in an un-
marked evidence envelope, to Detective Virigil Maples that same
night. When Assistant Chief Brumfield arrived at the police st-
ation after 5:00 a.m., Maples showed it to him, and then locked
it in the office of Chief Armand, who was not present at that
time. The next morning, the knife was given to Harold Varnado
from the Washington Parish Sheriff's Office, who assumed the in-
vestigation. Varnado testified that he took the knife from Ch-
ief Armand, and that to his knowledge Maples was not present.
However, Maples indicated that he himself gave the knife to Var-
nado. Harold Varnado then brought the knife to Mike Varnado, a
ranking investigator with the Washington Parish Sheriff's Office,
upon his request for all evidence. Mike Varnado then finally fil-
led out the chain of custody on the evidence envelope.R.p.916-918
1208-1210. In addition to the knife being placed in and then re-

-2-

moved from an evidence envelope and then placed back down on
the ground for photographing at the crime scene. Maples also
indicated that the knife had poked through the evidence envel-
ope by the time it was showned to Brumfield at 5:00 a.m..R.p.
952.

Virgil Maples noted that there was a dual video camera in-
side the store, which took video of the cash register and the
front pump. Maples viewed the video and observed McCain check-
ing out a customer a half hour or so before closing time, but
did not attempt to identify who the customer was. Noting noth-
ing out of the ordinary on the video, he did not consider it
vital evidence. R.p.924.

On December 5,1996, Franklinton police officer Dan Manning
was called out to assist in the investigation of Edna McBain's
disappearance. R.p.941. Manning and his assigned partner that
day were patrolling, looking for information when they observed
Rondy Vernon's car at the pool house a block away from the gas
station. The officers went to Rondy's sister's house to look
for him. His sister, Cherly Warren, had not seen Rondy in a cou-
ple of days, although he lived in the house adjacent to her own.
R.pp.946-947,983.

On December 6, Jorge Lara, a janitor at and electric company
in El Paso, found Edna McCain's purse inside of a plastic bag in
the parking lot of the electric company.R.p.1020. Lara turned the
purse into the El Paso police department after the security off-
icer on duty refused to receive it.

On December 7, McCain's car was located in El Paso. The El
Paso, detectives had it processed for evidence. Crime lab took
swatches of the seat for blood samples, and fingerprints from
the exterior and interior of the car, as well as from the purse
found by Lara. The samples taken from the car seats tested pre-
sumptively for blood, and Rondy Vernon was ruled out as the sou-
rce of blood from the seats and the knife. R.p.1119. There was a
one in eighteen thousand chance that the blood retrieved belonged
to Edna McCain.R.p.1128. No prints were identified from the inter-

ior of the car, nor from the purse. Six prints were retrieved
from the exterior, on the hood and trunk, some of which matched
the prints of Rondy Vernon. R.p.1082,1087.

On that same day, Rondy called Cheryl collect. According to
testimony, she told him the police were looking for him and beg-
ged him to turn himself in. He told her that it was okay to sp-
eak to a Sheriff's deputy who was a friend of the family named
Melvin Garrett. Cheryl then went to speak to Garrett, and gave
authorization for the police to record any future calls from
Rondy, and gave consent to put a trace on any call. R.pp.984,990-
991.

Cheryl, stated that during the conversation, she told Rondy
to let the woman go, and he said it might be too late. R.p.987.
He eventually told her that McCain was not far from a bus stat-
ion in El Paso. R.p.992.

On December 8, Rondy called his sister three times, and on
the last call advised his sister he was in Albuquerque. R.p.992.
All the calls were recorded, but only the final call was clear
on the tape. R.p.992. Rondy also said that he was depressed, af-
raid the police were going to kill himself. R.pp.1009-1010. Rondy
never told his sister that he kidnapped or robbed McCain, nor in-
dicated the circumstances by which he came to be in Texas with
her.

On December 8, Rondy Vernon turned himself in to Officer Cas-
sandra Estrada at the Albuquerque Police Department. Estrada pl-
aced him under arrest pursuant to an FBI warrant, and then tran-
sported him several blocks to the FBI office. Rondy told her he
was looking at a lot of time, to which Estrada replied he probab-
ly was. He asked if she had any advice, and she told him to tell
the truth and to remember his rights. She then turned him over
to FBI agents Williams and Leggitt without incident. R.pp.1087-
1095.

-4-

Agents Williams and Leggitt received Rondy at approximately
eight or nine o'clock that night. He was photographed and fing-
erprinted and advised of his rights. According to Williams,
Rondy admitted that he went to the gas station to buy cigarettes,
when he saw the woman coming out of the store and decided to rob
her with the kitchen knife he had. There was a struggle and his
mask fell off, and he believed the woman would recognize him be-
cause it was such a small town. He panicked and put her in the
car and started driving. He needed to put gas in the car, but
thought that if he stopped she would start yelling and try to es-
cape, so he decided to put her in the trunk when they neared Lake
Charles, Louisiana. He stopped and got gas and kept driving, win-
ding up in El Paso. Williams said Rondy admitted to using crack
at the time, but that he went back occasionally to check on Mc-
Cain, and gave her snacks along the way. He then checked into a
hotel in El Paso and spoke with his sister. The next day he went
to the bus station and got a ticket for Albuquerque, but before
leaving checked in with McCain and told her there would be a lot
of people in the parking lot and to make noise so someone would
hear her. He was adamant that she was alive when he left her the
last time. When he got to Albuquerque he went to the homeless sh-
elter, and was advised that the FBI had come around looking for
him, so he turned himself in. R.pp.1141-1148.

Agent Leggitt corroborated Williams' version of Rondy's stat-
ement with two exceptions. First, he indicated that Rondy had not
said there were a mask but a hat that fell off of his head, that
Rondy was not afraid of being recognized by McCain, because he
didn't know her. R.pp.1184. The statement was not audiotaped nor
videotaped, and was written down by Leggitt. Rondy refused to
sign the statement, according to Williams and Leggitt, because he
wanted to speak to his attorney first. In addition Leggitt stat-
ed that Rondy said he jumped out of the bushes and grabbed her.

-5-

R.p.Vol.4,39. Deputy Michael Varnado, investigator for the Washington Parish Sheriff's Office, videotaped around the K & S convenience store on the 5th of December, at 10:00 a.m., and the videotaping do not corroborate with agent Leggitt version of Rondy's statement.R.p.Vol.4,p.92.

Summer Arnold Sharp testified for the state at trial.Sharp was the payroll clerk at Trinity Marine, where Rondy was employed at the time. She indicated that she knew him personally from work, and that on December 5, Rondy picked up his paycheck at approximately 1:00 p.m., saying he was sick and that he needed medicine. She indicated that it was payday, and that Rondy seemed fidgety and nervous. He had not worked that day, nor on the fourth, because he was ill. The payroll office was in Madisonville, Louisiana.R.pp.1194-1197.

JoElla Hart testified on behalf of Rondy. She testified that she was the mother of his child, and that Rondy knew Edna from working at the gas company, as she would give Rondy and JoElla extensions on their gas bill when they lived together.R.p.1259.

Marcus Kagler also testified on behalf Rondy. Kagler was another inmate who was housed at one time in the same cell block as Rondy. Rondy was friends with Kagler's parents as well.Kagler indicated that he had seen Edna right around the time she disappeared and that he had observed Vernon Jenkins grab a bag from her and then run away. He also indicated that Jenkins was a drinker, a drug user, and had heard him verbally abusing Edna in the past. He worked in the past for Jenkins for a brief period of time.R.pp.1263-1273.

Rondy Vernon testified on his own behalf. He stated that he knew Edna McCain because she was always giving him extensions on his gas bill. When he arrived at the gas station that night, he had been looking for his cousin to go to the hospital with him so that he could get a flu shot and a doctor's excuse for missing work, as he did not want to go to the hospital by himself. Upon his arrival, he saw Edna sitting in her car crying.R.pp. 1281-1284.

-6-

She handed him a knife and told him to cut her, but he handed her the knife back and didn't know what she did with it. She asked him to ride to her sister's house with her, which he agreed to and got in the car. After a while, he asked if he could drive because she was driving erratically. She agreed, and the two switched places. They continued driving towards Kentwood, Louisiana, where Rondy knew Edna's sister lived. R.pp. 1285-1287. Edna finally told him that they were not going to Kentwood, Louisiana, but to Shreveport, Louisiana to see her sister. Rondy did not want to go that far because he had to work the next day, but Edna reminded him of all the times she had helped him out with the gas bill, so he agreed. R.p. 1288.

Edna gave him directions as they continued driving. They made several stops for gas and snacks, all paid for by Edna. At some point, while driving (InterState 20 West), Rondy drifted off himself and found they were in Texas. They pulled over at a rest area and Rondy got in the back and went to sleep, until Edna woke him up and said something was wrong with the hood. Rondy got out and slammed the hood back down. He noticed that there was a ground crew pouring asphalt in the area on Inter State 20 West. R.p. 1288-1295.

They took a nearby exit and went to another rest area for more snacks. Rondy then told Edna they were not going anywhere until she told him what was wrong. She finally told him that her boyfriend, Vernon Jenkins, had been drinking and fooling around around on her recently, and that night had come to her work at closing, struck her across the mouth and stole the bag with the night deposit. She indicated she didn't want to turn him in, but knew she would be in trouble because she neglected to call for a police escort to escort her to the bank with the deposit. R.pp. 1297-1298.

Rondy then told her the police would be looking for her, as the deposit was missing and she had not gone home that night. Edna worried about this, with Rondy telling her that she couldn't hide in the back seat because she could be seen by the police.

-7-

She suggested she hide in the trunk, which he agreed. Edna then climbed in the trunk of her car. R.p.1299. On 12/07, McCain's car was located in El Paso. The El Paso detectives had it processed for evidence no blood was found in the trunk.

Rondy then drove to a hotel in El Paso, where he checked in, leaving Edna in the trunk because there were too many people around. He went inside his room and fell asleep, and by the time he woke up and checked on Edna again, whe was non-responsive and he presumed she was dead. R.pp.1302-1303. He then ran around the room and found a phone and called his sister, but she didn't know what he was saying and hung up. R.p.1303.

He walked back to the hotel and checked out. He drove to a bus station, and parking the car two blocks away and left it there. He bought a ticket on the first bus that was leaving, which happened to be the bus to Albuquerque. R.pp.1308-1309. He wanted to take a bus back home, but no buses were leaving for Louisiana for several hours. In Albuquerque, he checked into a cheap motel and had something to eat. R.p.1309. He watched a parade and then went to the park, and kept trying to call his sister, but the circuits were busy. He was out of money, so he asked the operator to cut in and finally got through to her. R.pp.1309-1311.

He was depressed and suicidal, and went to a Catholic priest to pray for him. His sister had advised him there was a warrant out for his arrest, so he spoke to the priest, and following his advice, turned himself in. R.p.1313.

Rondy Vernon, Sr., denied robbing Edna or taking any money from her, with the exception of money she gave him throughout the car ride, for gas and snacks and the hotel romm. He also denied picking up his check on the day Summer Sharp testified that he did, and said that his mom and girlfriend JoElla picked up the check for him. He also refused to sign the FBI statement because it was not true, and he testified that he did not say the things the FBI agents claimed he said. R.pp.1315-1317.

-8-

## II. MISSING TRANSCRIPT

Petitioner contends that his constitutional rights under the Due Process Clause of the 14th Amendment to the United States Constitution was abridged because the government failed to provide new counsel on appeal with a significant portion of his transcript.

### A. Standard of Review:

Under A E D P A, Petitioner must prove that: 1) the State Court decision contrary to, or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. 28 U.S. C. Section 2254 (d)(1)(2). See Williams v. Taylor, 529 U.S. 363, 405(2000).

### B. Law/Argument:

In Hardy v. U.S., 375 U.S.277,84 S.Ct.424, 11 L.Ed.2d 331 (1964). The Court clearly established that "where counsel on appeal was not counsel at the trial, the requirements placed on him by Ellis v. U.S.(citation omitted) will often make it seem necessary to him to obtain an entire transcript".Id.at S.Ct.427. The whole purpose of this rule is for new counsel to be given the opportunity to raise plain errors and defects in the case. Id.

The present case presents an issue with respect to whether the victim voluntarily traveled with petitioner and voluntarily entered the trunk where she was later found or not?

In U.S. v. H.Selva,No.76-1612,559 F.2d 1303(09/28/77) Citing Hardy in pertinent part, ...A court-appointed counsel who represents the indigent on appeal gets at public expense, as a minimum, the transcript which is relevant to the points of error assigned. . . . But when, as here, new counsel represents the indigent on on appeal, how can he faithfully discharge the obligation which the court has placed on him/her unless he /she can read the entire transcript. . . . The right to notice 'plain errors or defects' is illusory if no

-9-

transcript is available at least to one whose lawyer
on appeal enters the case after the trial is ended.
(Citations omitted.)
375 U.S. at 279-280, 84 S.Ct.at 426-427. While Hardy
involved no violation of the Court Reporter Act, the
policy expressed in the opinion is clear and has been
adopted by this court. C, e.g., U.S. v.Upshaw,448 F.2d
1218 (5th Cir.1971);U.S. v. Rosa, 434 F.2d 964 (5th Cir
1970).

The Petitioner argues that the missing transcript to the
Daubert Hearing is insufficient to enable appellate counsel,
Petitioner, and this court to review the proceedings for er-
rors. Petitioner further contends that he did not waive his
right to judicial review, and is prejudiced by the missing tra-
nscripts in this case.

The transcript of this hearing would thus not be of a minor
event, favorably resolved to the defense, which has previously
been upheld to not be violative of the appellant's right to jud-
icial review. State v. Lacaze, 1999-0584 (La.1/28/02),____So.2d
_____,2002 WL 99729. This transcript is of a hearing ruled ag-
ainst the appellant, and is of tantamount importance, in that
if the motion was wrongfully denied, the appellant would rece-
ive a new trial. The issue can not be reviewed without the tt-
anscript, and as such, greatly compromises the appellant's rig-
ht to full judicial review of his appeal.

Trial counsel for petitioner filed a Motion for a Daubert
Hearing, requesting the court to assess whether the State's
purported evidence met the standard of Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579, (U.S.Cal. 1993) as adopted
by the Louisiana Supreme court in State v. Foret, 628 So.2d 1116,
(La.1993).

According to the minute entries, the hearing was held on Jan-
uary 28, 1999, and the judge ruled that the DNA evidence was ad-
missible. However, it is impossible to review this ruling with-
out the transcript, prejudicing the appellant's right to appell-
ate review.

Specifically, the petitioner complains that the court reporter did not transcribe the tapes that contains the testimony of a state expert witness, that testified to Ms. Alice Hill/ Brown work. This Court nor Petitioner can view the transcripts for errors that possible could have occurred by Ms. Hill, this complete omission does render it impossible to determine the testimony of the State expert witness, statements, charges by the court, and objections, questions, statements and arguments of counsel".[2]

The DNA evidence was crucial in this case, as the victim's blood was purported to be on a knife and on the seats of her car.[3] This is in effect the only evidence that controverts the petitioner's theory of defense, that the two were traveling by agreement, as opposed to traveling by force.[4] Without the victim's blood being retrieved from these two areas, it is probable that the state would have been unable to prove a kidnapping or armed robbery had occurred. Thus, the admissibility of the DNA evidence was a major factor in the conviction.

Addition, petitioner argues that the record is insufficient for this court to make a meaningful review because the tapes was never transcribe to review Ms.Hill,error rate, error fate for the FBI laboratory, for the industry in general. How do they substantiate whatever claim they make? How would petitioner would ever know if Ms.Brown or Dr. Callaghan work pertaining to the external proficiency testing was there a mistake or error of some type was made.

The transcript of this hearing is necessary for petitioner and this court review, as the blood evidence was so key in the conviction of the petitioner. This is especially so in light of the fact that the detective who eventually attempted to write out the chain of custody on the evidence envelope for the knife testified that the knife was not retrieve properly and had been compromised,and the chain of custody not even properly documented by the officers who handled it prior to him.[5] Thus, the evidence presented by the state on the issue of potential DNA evidence from the knife was of critical importance.

Since Ms. Alice Hill/Brown performed the analysis and Dr. T. Callaghan reviewed her work, Dr. Callaghan credential comes into questioning when asked on cross-examination by petitioner counsel, do you know Edna McCain was a Caucasian female. Do you know that? A. I don't know that right now. I saw from the picture, but I will take that.(Vol.3, p.151). . . . On examination by the District Attorney Mr. Murray question Dr. Juan Contin, medical examiner for El Paso County, Texas. Q. Okay. Who all was present at the time that you did the autopsy? A. Well, Mr. Pacheco was the assistant doing the autopsy. In addition that there was a Mr. Benson from the FBI, Cornell from the FBI, Switser, Cortez and Callaghan from the FBI,.(Vol.2, p.23). Being deprived of the opportunity to review the witnesses and evidence put on by the state for this hearing deprives the petitioner and this court of an opportunity to review the records. Also deprives the petitioner of his constitutional right to an adequate review of this issue for his appeal.

Additionally, this is also not a transcript of a relatively minor event, and it was a motion resolved against the petitioner. Thus, the transcript is necessary for full review. It has previously been held that where defendants were subject to imprisonment for fifteen years, they were entitled under the constitution to appellate review based upon a complete record of the evidence upon which their conviction was based. State v. Diggs, 657 So.2d 1104, (La. App. 4th Cir. 1995). The same must hold true for the life sentence imposed upon the appellant.

## CONCLUSION

Wherefore, the Petitioner's conviction and sentence should be reversed.

## III. SUBJECT MATTER JURISDICTION

Petitioner contends that Louisiana did not have subject matter jurisdiction to try him for murder. All the substantive

-12-

elements and aspects to the death of Ms. Edna McCain occurred in
Texas. Without Venue to try Petitioner for murder, Louisiana was
without jurisdiction in the matter; therefore, his conviction and
sentence must be set aside.

A. Standard of Review:

Under A E D P A, Petitioner must prove that: 1) the State Co-
urt decision is contrary to or involved an unreasonable applicat-
ion of, clearly established federal law as determined by the U.S.
Supreme Court; or 2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence
presented in the State Court proceeding. 28 U.S.C. Section 2254
(d)(1)(2). C Williams v. Taylor, 529 U.S. 363, 405 (2000).

B. Law and Argument:

The U.S. Supreme Court has clearly established that a crime
committed within any State must be tried in that State and in a
district previously ascertained by law. Jones v. U.S., 137 U.S.
202, 34 L.Ed. 691 (1890); Sixth Amend. to the U.S. Const. and
14th Amend. U.S. Const.

The State contended Petitioner Kidnapped Ms. McCain around the
time she left work at 10:30 p.m., on December 4, 1996.[6] Petitioner
contends he and Ms. McCain mutually left Franklinton, Louisiana
together at approximately 11:00 p.m. that night. This approximate
time is not disputed.[7]

The fact at trail proves that it takes roughly 17 hours to
drive from El Paso to Franklinton, La.,[8] and roughly 19 1/2 hrs. to
drive from Albuquerque to Franklinton, La..[9] Because of these esta-
blished times their arrival in El Paso was no earlier than 4:00
p.m. on December 5,. Sometimes on December 5, 1996, petitioner ch-
ecked into Room 106 of the Americana Inn, in El Paso.[7]

Petitioner made a collect call to his sister, on December 6
at 3:12 a.m. (2:12 a.m. El Paso time) from the Americana Inn esta-
blishing that he and Edna McCain arrived in El Paso between 4:00
p.m. and 12:00 at the latest.[10] This also means that he and Edna

would have had to leave the Franklinton area no later than 10:00 a.m. on December 5,1996.[8]

Petitioner made collect phone calls from Albuquerque to his sister on December 7,1996, at 1:19 p.m.(12:19 p.m. Albuquerque time).[11] He made another collect call from Albuquerque to his sister on December 8, at 11:45 a.m.(10:45 a.m. Albuquerque time).[12]

Petitioner was in the El Paso/Albuquerque area the entire time as it would have been impossible for him to make these calls driving back and forth to Louisian, putting Petitioner in the El Paso/Albuquerque area for roughly 95 hrs. before turning himself in to the authorities.[13]

These time frames establish Edna was in the El Paso and/or Albuquerque area roughly 75 1/2 hrs. before her body was discovered on December 7, at 6:09 p.m.[14] This shows Ms.E.McCain's death occurred at least 32 to 40 hours after arriving in El Paso, thus, no substantive element or aspect of her death could have occurred in Louisiana.[15]

Dr. Contin, testified Ms. McCain had only minor injuries that did not contribute to her death, that she had been dead only a few hours when she was found.[16]

Few is described by "Webster's II New College Dictionary" as follows: "Amounting to or made up of a small number".

The exact time of death then, happened within a relatively small span just prior to Ms. McCain being found.[16] Her Death Certificate lists her date of death as December 7,1996.[14] Her death was determined by the Coroner to be caused by Hypothermia.[14]

Her body was discovered in the trunk of her car on December 7,1996, at 6:09 p.m. even being generous with the time frames involved, Ms.McCain's time of death would have occurred roughly after Noon on December 7,.Therefore, all the essential elements and factors leading up to her death occurred in the State of Texas.[14]

-14-

Louisiana Code Criminal Procedure, Article 611 provides:

All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.

Even if it could be proven that Petitioner killed the victim with specific intent, which he disputes it can, no part of that crime occurred in Louisiana. Even if it could be proven he killed the victim without specific intent the Court would still be without venue in the matter. The State would still have to prove the essential element for the crime, the killing of a human being. However, this essential element could only have occurred in Texas The only thing the State could possibly prove was one of the crimes listed in the felony murder doctrine. Felonies listed under the felony murder doctrine support a second degree murder conviction, not a murder that takes place in another state. State v. Ellerbe, 47 So.2d 30 (La. 1950); State v. Gates, 630 So.2d 1345(La App. 2 Cir. 1994).

Armed robbery and kidnapping are not substantive elements or aspects of murder. They are nothing more than felonies that can be used to support a charge of second degree murder. However, the felonies under the Louisiana felony murder doctrine cannot be used to support a non specific intent murder in another state.

Venue is jurisdictional in a criminal case and in a case where there is improper venue the Court does not have jurisdiction of the case. State v. Williams, 817 So.2d 470, 2001-1511 (La. App. 3 Cir. 5/8/02); State v. Brown, 626 So.2d 851 (La. App. 2 Cir. 1993).

## CONCLUSION

In light of the foregoing, Rondy Vernon, Sr., (Petitioner) conviction and sentence should be overturned and the entire prosecution dismissed as the Court was without venue and jurisdiction in this matter.

-15-

## IV. INEFFECTIVE ASSISTANCE of COUNSEL

Petitioner contends that he received ineffective assistance of his counsel in various prejudicial stages of his prosecution.

### A. Standard of Review:

Under A E D P A, Petitioner must prove that: 1) the state court decision is contrary to, or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or 2)resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the States Court proceeding. 28 U.S.C., Section 2254; C Williams v. Taylor, 529 U.S. 363,405(2000).

In Strickland v. Washington,466 U.S. 668,686,104 S.Ct. 2052, 2063(1984), the CCourt clearly established the standard in assessing a claim of ineffective assistance of counsel,that is, deficient performance that prejudice the right to a fair trial (undermining confidence in the verdict.

A. Failed to Investigate the Competency of the Members of the Grand Jury:Defense counsel failed to investigate the composition of the members of the grand jury that indicted Petitioner to uncover any irregularities that would have cast doubt on the integrity of the indictment that was returned against Petitioner. Counsel should have discovered that Petitioner's ex-sister-in-law was on the panel and subsequently served as the grand jury foreman. Counsel should have discovered this source of highly probable bias and prejudice against Petitioner and moved to quash the indictment based upon the make of the panel.[17]

Ms. Ginger Bickham not competent to serve as a member of the Grand Jury. Petitioner recently learned that Ms.Ginger Bickham served on the grand jury that returned two indictments against him.[18] He contends she was not competent to serve on the grand jury and that he suffered grave prejudice as a result of her serving on the panel.

La.C.Cr.P.Art.401. General qualifications of jurors states in pertinent part: . . .(B). Notwithstanding any provision in Subsection A, a person may be challenged for cause on one or more of the following:
(2) When reasonable doubt exists as to the competency of the prospective juror to serve as provided for in Code of Criminal

-16-

Procedure Article 787.

La. C. Cr. P. Art. 787. Disqualification of petit jurors in particular cases states: . . . The Court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case.

Ms. Bickham is the sister of Petitioner's ex-wife, Ms. Rhea Brumfield Vernon( now known as Ms. Rhea B. Batiste). [19] Petitioner asserts that because of the high probability of bias and prejudice towards him that she was not competent to serve on the grand jury.

Petitioner divorced his ex-wife, in November of 1996 just one month prior to the empaneling of the grand jury. [20] Due to the strong family bond between Ms. Bickham and Ms. Vernon(Batiste) it is highly probable that Ms. Bickham harbored bad feelings and ill-will towards Petitioner stemming from the recent divorce of Petitioner and her sister, as in most cases, divorces are the result of bad feelings and ill-will themselves. Petitioner contends that she was not competent to serve. State v. Frost, 97-1771 (La. 12/1/98), 727 So. 2d 417; State v. Martin, 1998-1809(La. App. 3 Cir. 5/19/99), 736 So. 2d 315; State v. Hill, 46 La. Ann. 736, 19 So. 145(Sup. 1894).

Here the facts reasonably conclude the relationship between Petitioner and his ex-sister-in-law, as a result of the divorce was one that any casual observer would have been led to believe would have swayed her opinion against Petitioner keeping her from being fair and impartial while serving on the grand jury. The Trial C ourt should have learned of Ms. Bickham's relationship to Petitioner and discovered this probable source of prejudice and bias against Petitioner.

Petitioner and his ex-wife's marriage ended on les than amicable terms and thus Ms. Bickham should have been excused from serving on the grand jury that indicted him. Even the slightest bit of animosity Ms. Bickham would have harbored against Petitioner as a result of his divorcing her sister rendered her incompetent to serve as a fair and impartial juror.

Based on the foregoing Petitioner's conviction and sentence should be overturned.

Part(B):

Ms. Ginger Bickham Not Competent To Serve as Foreman of the Grand Jury:

For the sake of brevity, Petitioner adopts the law and arguments in above claim La. C. Cr. P. Art. 401. General Qualifications of Jurors . . . Just prior to the opening arguments, the Clerk of Court read Petitioner's indictment in open Court. At the conclusion of reading the indictment the Clerk stated that the indictment was signed by "Singer" Bickham. Because the Clerk of Court pronounced the name "Singer," which did not sound closely related to her real name of "Ginger" Petitioner was unaware that the person who sat as foreman of the grand jury that returned the indictment against him was his ex-sister-in-law.

Article 1, Section 15 of the Louisiana Constitution of 1974, as amended, states in pertinent part:

> Prosecution of a felony shall be initiated by indictment or information, but no person shall be held to answer for a capital crime or a crime punishable by life imprisonment except on indictment by a grand jury.

Ms. Bickham, Petitioner's ex-wife's sister was selected to serve as the foreman of the grand jury that returned the indictment against Petitioner. This prejudiced Petitioner even further as it not only allowed a person withaa person with a high probability of harboring bad feelings and ill-will towards him stemming from the recent divorce of Petitioner and her sister to sit on the grand jury, but to actually lead the grand jury during its deliberations in the matter as in addition his/her other duties, the foreperson has the same voting power as other members of the grand jury. Campbell v. Louisiana, 532 U.S. 392,118 S.Ct.1419,No. 96-1584(decided April 21,1998).

Foreman is described by the "American Heritage Dictionary" of the English Language, New College Edition(1981), as follows:

"1. A man who has charge of a group of workers, as at a fac-
tory or ranch. 2. The chairman and spokesman for a jury".

When an individual is appointed as foreman, he/she would have
a degree of influence over the other jurors, because of the stat-
us of foreman, subjecting that system to the possibility of abuse.

Petitioner respectfully reiterates that the grand jury cont-
rols not only the initial decision to indict, but the significant
decision to charge capital offense. Therefore, the integrity of
those decisions depends on the integrity of the process used to
select the grand jurors.

Wherefore, based on the foregoing Petitioner's conviction and
sentence should be overturned.

C.   Failed to Obtain Copy of Trinity Marine Products Secrutiy
     Log Book:

Petitioner contends that he was on his way to El Paso, Texas
at the time Ms. Arnold claims he was at Trinity Marines.[7] Petitioner
contends that had defense counsel obtained a copy of the security
log book from Trinity Marine or talked to the security officer
who worked at Trinity Marine for the day in question it would
have proven that he did not enter the premises on that day.[22]

Petitioner contends this was critical to his defense to dev-
elop he was in another state when the victim passed away, along
with his defense that the victim was with him voluntarily, the-
reby rendering the State of Louisiana without venue to try him
for murder.[15] Had defense counsel pursued this viable line of defense
it is highly probable that Petitioner would have prevailed on the
claim.

Based on the foregoing Petitioner's conviction and sentence
should be overturned.

D.   Failed to Obtain Motel Records and Receipts:

Petitioner called his sister on December 6th from the Americ-
ana Inn in El Paso.[10] No law enforcement officer ever took photo-
graphs of the victim or Petitioner to the Americana Inn to see if
they could be identified as having ever been registered there not

was there ever a request to do so from any law enforcement org-
anization.[23]

Defense counsel was aware of this call and the fact that Pet-
itioner knew the victim personally. He should have had an invest-
igator take photographs of the victim and Petitioner to the Inn
and the surrounding area to see if anyone could remember seeing
either one of them. Petitioner has always maintained that the
victim left with him voluntarily, as one friend trying to help
another friend through some personal problems, and that someone
at the Inn or the surrounding area could have verified that the
two of them were together mutually.[24]

This would have been critical to the defense of Petitioner in
the pursuit of proving his innocence. Counsel was remiss for not
fully investigation this line of defense and denied Petitioner any
chance of a fair trial.

Based on the foregoing Petitioner's conviction and sentence
should be overturned.

E.   **Failed to Investigate Whether There Were Eye-Witnesses Who
Could Have Identified Victim and Petitioner as They Traveled:**
Testimony showed Petitioner knew Ms. McCain.[25] Further, Petitioner
gave a detailed account of the route he and Ms. McCain traveled.
Counsel should have hired an investigator to retrace Petitioner's
route to see if he could find any eyewitnesses that would have co-
rroborated Petitioner's version of events.[26]

Based on the foregoing Petitioner's conviction and sentence
should be overturned.

F.   **Failed to Investigate Relationship Between Victim and Vernon
Jinkins and the Background of Vernon Jenkins as it Relates to
this Case:** . . .Petitioner contended that Ms. McCain was having
some problems with her boyfriend, Vernon Jenkins, and that she
heeded Petitioner's help.[27] She complained of the way Mr. Jenkins tr-
eated her and that it was Mr. Jenkins who took the money from the
K & S that night.[28] That would explain why the last 45 minutes of
the tape is missing.[29] A cover up to keep her out of trouble. She
asked Petitioner for his help.[30]

This would have been critical to the defense of Petitioner in
the pursuit of proving his innocence. Counsel was remiss for not

fully investigating this line of defense and denied Petitioner
any chance of a fair trial. Counsel should have hired an invest-
igator to investigate Vernon Jenkins's background to see if any of
the allegations made by Petitioner could be supported by witnesses
This was a viable, plausible defense and counsel should have vig-
orously pursued an investigation in this area trying to prove Pe-
titioner's version of events.

Based on the foregoing Petitioner's conviction and sentence
should be overturned.

G.  Failed to Investigate Other Evidence Found at the Crime Scene,
    i.e. Comb, Lottery Ticket, Etc.: . . . Their were several item
of evidence found at the crime scene that to this day have never
been tested or investigated.[31] Defense counsel should have had an
expert examine the lottery ticket, rat tail comb, and any other
evidence that was found at the scene that could have possibly po-
inted to someone else involved in the incident.[32] Perhaps the evid-
ence would have belonged to someone who would have been on the
scene to corroborate Petitioner's version of the events.

Based on the foregoing Petitioner's conviction and sentence
should be overturned.

H.  Failed to Investigate the Weather the Night of the Alleged
    Crime: . . Defense counsel should have gotten the weather
statistics for the night in question from the weather service to
verify what the weather was actually like.[33] There were discrepan-
cies in testimony as to when it rained, but all agreed that it
rained throughout the night.[34]

How could the officer have painted the marks on the ground
when it was raining at the time they retrieved the knife? If they
replaced the knife on the ground to photograph it after it rained
it would have been further contaminated it. And if it was raining
the moisture would have affected any testing done on the knife.

The weather that night played a crucial role in the integrity
of the evidence and defense counsel should have procured this evi-
dence in order to more effectively argue his cause.

Based on the foregoing Petitioner's conviction and sectence
should be overturned.

I.  Failed to Investigate the Relationship of Petitioner and
      Ms. McCain.  . .Petitioner informed his attorney that he
had information that he and Ms.Edna really did have a relation-
ship. Petitioner requested his attorney to investigate this in-
formation, however, counsel did not do so.[35]

      Counsel should have investigated this crucial line of def-
ense, putting the State's case to the adversarial testing pro-
cess that his client is entitled to. Counsel was remiss in not
investigating the relationship between Petitioner and Ms.McCain
to establish they were friends and that it was highly probable
the two of them mutually left Franklinton together and that she
was not kidnapped.[36] Counsel should have procured this evidence
in order to more effectively argue his cause.

      Based on the forgoing, Petitioner's conviction and sentence
should be reversed.

**************************************************************
Claim 8 (B): Failed to Hire an Expert in the Field of D N A
                Technology.
**************************************************************
A.  Failed to Test the Victim's Fingernail Clippings: The El
Paso Police Crime Scene Technician took into evidence two en-
velopes of nail clippings of the victim. Defense counsel should
have had testing done to show nnne of Petitioner's DNA trapped
underneath, proving that she did not struggle with Petitioner.[37]
This would have been crucial since the State alleged the victim
and Petitioner had a struggle without any shred of evidence pre-
sented to prove this.

      Ms. Montgomery, M.S., Forensic Laboratory Director, Reliagene
Technologies, Inc., brought up the question to defense counsel of
why the nail scrapings collected but not processed for DNA? Def-
ense counsel, while learned in the law, is not trained in the
scientific field of DNA technology, and since this could have been
such a crucial area that could have proven that Ms. McCain volunt-
arily left the area with Petitioner, counsel was remiss for not se-
eking funds and obtaining an expert in the field of DNA Technol-

-22-

ogy at trial.[38]

Based on the foregoing Petitioner's conviction and sentence should be overturned.

B.  **Failed to Have Expert Test the Blood Found on the Knife and**
    **To Dispute the Statistical Data of the State's Expert:** None
of the blood samples collected from the victim or her car were
linked to anyone.[39] Petitioner was 100% excluded as the contribut-
or of blood on the knife handle and both cuttings taken from the
seat, the three items that were DNA tested.[40] The victim could not
be excluded as the potential contributor of blood on the knife
handle and both cuttings taken from the seat, the three items
that were DNA tested.[41]

However, it could not be concluded that the blood on the
knife handle and seatbelt was that of the victim. The only opin-
ion was that it "could" have been the victim's along with many
other persons. It could not even be narrowed down to any partic-
ular race through testing.

An opinion was that the probability of selecting an unrelat-
ed individual at random having the same TM and DQ Al types as
detected in the questioned specimens is approximatel one in 18,
000 in the black population, one in 690 in the Caucasian popul-
ation, one in 950 in the Southeastern Hispanic population, and
one in 880 in the Southwestern Hispanic populaion.[42] These percen-
tages of possible contributors of the blood type in question
makes it nearly impossible to narrow down the donor.

The blood found on the knife handle and seatbelt could have
been the blood of a black person, a caucasian person, a South-
eastern Hispanic person, or a Southwestern Hispanic person. Had
defense counsel hired his own independent expert he could have
brought to the jury's attention that the only thing proved by
the State was that the blood found on the knife handle and seat-
belt could have come from just about anyone of the many citizen's
living in the area.

The blood on the knife came off the forward handle, not on the blade. Also testified that the results of DNA testing on the knife was the same for both cuttings taken from the seats.[43]

There was nothing remarkable in the State expert's testing and results of his testing linking the victim as the source of blood on the knife handle and seatbelt. Therefore, the State's expert testimony could have been easily challenged by an expert hired by defense counsel.

Defense counsel should have  hired his own expert to do DNA testing on the evidence in question. Another expert may have been able to make a more accurate match of the DNA, narrowing it down more specifically to exclude the victim, especially in regards to the knife. And, especially since there is nothing linking Petitioner to the knife.

Defense counsel should have hired an expert to review the results of the State's expert and reviewed his statistics to see if they were viable. The use of a defense expert in the field of DNA could have been the thing that would have turned the tide in the case and swung the balance in Petitioner's favor, resulting in a finding of not guilty.

Defense counsel was advised that, "Although the FBI DNA testing laboratories have recently been accredited by the ASCLD-LAB (American Society of Crime Lab Directors-Laboratory Accreditation Board), was the laboratory in compliance when this particular case was possessed?" It was pointed out that he should ask about the known or potential error rate for the FBI laboratory; for the personwho did the testing and for the industry in general. Also, how do they substantiate whatever claim they make.[44] It was also pointed out that in relation to the reported statistics of of the State's expert, roughly 1/2 million Americans in the U.S. and roughly 1700 people in the New Orleans Metro Area could have been a contributor of the blood found on the knife. It was questioned why additional testing was not performed that might have excluded the victim.[44]

Based on the foregoing Petitioner's conviction and sentence

should be overturned.

## Law and Argument

The United States Supreme Court in Ake v. Oklahoma, 105 S.Ct. 1087 (1985), recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. Counsel should obtain independent experts for consultation and to help him understand the scientific and technical information presented by the State, for while all attorney's should be highly skilled in the practice of law, they are rarely learned in teh various scientific areas that an expert is usually called for. Independent experts for the defense should be used for such things as going to the Crime Lab or expert's office and "eye-balling" the evidence, asking the expert to review the case with him, viewing the techniques used in testing the evidence, and for an abundance of other issues dealing with its case that counsel can gain only with the assistance of an expert knowledgeable in the specific applicable fields.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may tesify thereto in the form of an opinion or otherwise. Expert testimony is scientific, technical, or other specialized knowledge that is used to assist the trier of fact to understand the evidence or to determine a fact in issue. See La. C. E. Art. 702. In order to effectively deal with expert testimony and evidence presented defense counsel must ask the question derived from Daubert, supra.

Counsel must be able to contest the expert testimony provided by the prosecution's witnesses. To cross examine these witnesses effectively and to present rebuttal evidence in the defense case, counsel must consult frequently with independent defense experts, who can determine the validity of results reached by the State's witnesses. Often independent testimony is necessary. Without proper assistance, completly erroneous conclusions reached by the

State's expert witnesses may be accepted as uncontested facts by the jury. Assistance in proper cross-examination of the prosecution's witnesses may be absolutely critical to the defense case. See, e.g., <u>Moore v. Kemp</u>, 809 F.2d 702(11th Cir.1987)(en banc)( holding that <u>Ake</u> implies a constitutional right to other experts for various functions. In that case, the experts were to review tests performed by the State crime laboratory). In this case the evidence was tested by the FBI Laboratory, another branch of the government that had an interest in proving Petitioner's guilt. Counsel should have had an expert that was not partial to the prosecution to test the evidence.

Based on the foregoing Petitioner's conviction and sectence should be overturned.

C.  <u>Failed to Hire an Expert in the Field of Forensic Pathology.</u>

A.  To Investigate Cause and Time of Death of Victim: Testimony showed the victim was dead only a few hours before she was found, but that there's not an exact way to establish the time of death of the victim, an expert qualified in the field of forensic pathology can estimate the time of death within a relative amount of time, positively proving the death occurred in Texas.[45]

The exact time of death could have been narrowed down to a relatively small time span. This would been critical to various aspects of Petitioner's trial, such as proving venue, intent, logistics, various other elements of the alleged crime, etc.

The use of an expert in forensic pathology would have been critical in light of the fact that the State's expert testified most people are ignorant concerning the danger of hypothermia. If it could have been proven that the victim was not forced in the trunk, it could have easily been shown that the victim's death was nothing more than a tragic accident.

For the sake of brevity see law and argument in Claim 8(B). Based on the foregoing Petitioner's conviction and sentence should be overturned.

B. <u>Investigate Whether Victim Appeared to Have Been in a Stru-
gle Before Going in Trunk</u>: One of the State's theories was
Petitioner armed robbed the victim, struggling with her, forcing
her into the trunk of the automobile. However, that the victim
willingly got into the trunk as was alleged by Petitioner.

Based on the foregoing Mr. Vernon's conviction and sentence
should be set aside and this case should be remanded for a new
trial.

For the sake of brevity see Law in Support: in Claim 8(B)B.

Based on the foregoing Petitioner's conviction and sentence
should be overturned.

Claim 8(D): <u>Failed to Challenge Alleged Expertise of State
Expert, Dr. Juan Contin</u>. . . . The defense counsel
made no attempt to challenge the expertise of Dr. Juan Contin
despite the fact that neither the Prosecutor or Trial Judge made
any attempt to determine whether or not he was the expert the
State claimed he was.[46]

The Court qualified Dr. Contin in the field of forensic path-
ology without making an independent ascertainment of his cred-
entials, i.e., his competency, experience, or qualifications.[46]

When faced with the proffer of expert testimony, the judge
must determine at the outset if the expert is proposing to test-
ify to scientific knowledge that will assist the trier of fact to
understand or determine a fact in issue. This entails a prelimin-
ary assessment of whether the reasoning or methodology underlying
the testimony is scientifically valid and if whether that reason-
ing or methodology properly can be applied to the facts in issue.
<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579,592,
113 S.Ct. 2786,2796,125 L.Ed.2d 469 (1993).

In fulfilling this gatekeeping role, the Court must ensure
that the proffered evidence is not only relevant, but reliable, by
utilizing a flexible approach requiring that consideration be
given to factors such as whether the technique can be (and has

been) tested, whether it has been subjected to peer review and publication, whether there is a known or potential rate of error and whether the relevant scientific/expert community generally accepts the technique. Louisiana has adopted the standards for admissibility of expert opinion as set forth in Daubert, and Foret, supra.

The Trial Court failed in its gatekeeping role of ensuring Dr. Contin was the expert the State claimed him to be. The Judge failed to have Dr. Contin show proof that he was actually qualified as a forensic pathologist by was of experience, documentation of his schooling, certifications or that he had previously been qualified as a expert.

This abuse of judicial discretion in qualifying Dr. Contin as an expert in forensic pathology had grave consequences for the defense in this matter. The jury was led into a false sense and belief that the alleged facts presented by Dr. Contin could be held reliable and unquestionably led to the defendant being found guilty.

**The State's case centered around the testimony of Dr. Contin in various areas, such** as cause of death, time of death, etc. Yet counsel did not ensure that the person who allegedly would be testifying to this for the State, was qualified to do the testing in question and to ascertain if the methods and equipment used in this testing met certain scientific criteria.

Had defense counsel challenged the expert's qualifications and testing method he quite possibly could have shown that the results of the alleged testing to be false or materially different He did not act as an advocate for his client, nor did he submit the State's case to the meaningful adversarial testing that his client deserved and was entitled to.

Petitioner asserts that these strategic choices were less than reasonable and so prejudiced his case that the resulting verdict is **not worthy of confidence.**

Based on the foregoing Petitioner's conviction and sentence should be overturned.

Claim 8(E):   Failed to Challenge Alleged Expertise of State

Expert, Dr. Callaghan. . . . Defense counsel made
not an attempt to challenge the expertise of Dr. T. Callaghan
despite the fact that neither the prosecutor or Trial Judge made
any attempt to determine whether or not he was the expert the
State claimed he was.

For the sake of brevity, Petitioner adopts the law and arg-
ument in Claims 8(D) & Missing Transcript above. Based on the
foregoing Mr. Vernon's conviction and sentence should be set as-
ide and this case should be remanded for a new trial.

Claim 8(F):   Told Prospective Jurors They Were Court Appointed.

During voir dire defense counsel stated they both were app-
ointed by the Court to represent Petitioner.[47] This no doubt had
an effect on how the jury viewed Petitioner. An Indigent defend-
ant is entitled to representation at trial just like those who
can afford counsel. Yet those defendant's don't have counsel who
stand up and say "The defendant is paying us a lot of money to
represent him in the matter." There was no strategy in telling
the jury that they were Court appointed.

In fact, it could only have made the jury look down on def-
endant. That the only reason these two men were representing him
were that they were Court appointed. That if they truly believed
in their cause they wouldn't have mention this at all. In essence
it gave the message to the jury that,"Here we are, against our
free will, so you all do what you have to do."

Based on the foregoing Petitioner's conviction and sentence
should be overturned.

Claim 8(G):   Failed to Properly Challenge Improper Handling of

Knife and Crime Scene. . . . Defense counsel totally
failed to properly challenge the handling of the knife at the cr-
ime scene.[48] The knife in question was not discovered the first
time an officer visited the scene.[49] When a second officer visited

the scene he allegedly found a knife on the ground in plainvview. This officer picked it up with gloves and put it in something like a cardboard paper towel roll cylinder.[50] The weather was changing, it was sprinkling a bit. It was then placed in the trunk of the patrol car.

Due to the poor handling of the knife in question no one could testify for certain at trial if the knife introduced in evidence was the one found at the crime scene. The knife was not properly marked or tagged.[51] A knife is not normally put in a tube with the ends creased. This is not standard crime scene investigation protocol. The scene should have been roped off and secured until the detective arrived to properly process the scene. The knife was returned to the scene after it had been raining and after hours of the crime scene not being secured, the integrity of the knife and the protection of it from being contaminated was seriously compromised.[52]

Petitioner has shown that the police mishandled the evidence and crime scene so poorly that he has been denied his fundamental right to a fair trial, and his rights to due process and equal protection of the law.

Police Returned Knife to Scene The knife was returned and placed on the crime scene after several hours.[7B] During those several hours the crime scene was not roped off and secured, it rained, etc. This seriously compromised the integrity of the evidence in question. This is a direct violation of standard police protocol and led to the contamination of the knife in question.[53]

Failed to Properly Preserve the Crime Scene, it wasn't until several hours later, after it had rained, people had come and gone etc. the crime scene was finally roped off and secured.[52]

It wasn't until some officers had made at least three trips to the crime scene that someone decided to rope off the area to preserve the scene.[52] This was only done after hours of evidence being removed from the scene, evidence being replaced on the scene rain and police and civilians coming and going from the scene for hours. The integrity of the crime scene can only be seen as compromised and diminished and any evidence or results of testing on any evidence from the crime scene is highly suspect.

-30-

The police realized that they compromised the evidence and
scene so severely that they went so far as to falsify their re-
ports. Petitioner has shown that the police mishandled the evid-
ence and crime scene so  poorly that he has been denied his fun-
damental right to a fair trial, and his rights to due process
and equal protection of the law.

What counsel glaringly missed is that the Supplementary Inv-
estigation Report of December 6th, 1996, states that," . . . Dis-
covered a knife laying on the ground in the approx. area of where
the employees park. . . put a pair of rubber gloves on and placed
the knife into a brown evidence bag and placed it into my locked
patrol unit. . . did not put any marks on the bag as to it's con-
tents or to where it was  located and who located, because there
was only two officers working at the time and I was extremely
busy trying to secure the scene and any other evidence that might
be at the scene. Upon leaving the scene I returned to my office
which is where I turned the brown evidence bag which contained
the knife from the scene over to Sgt. Virgil Maples. . ."[54]

This directly contradicts the testimony of the other two off-
icers about the knife being placed in a cardboard paper towel
holder and that the scene was not secured until after the arrival
of the detective, some three hours after the first officer arrived
on the scene. It is clear from this report that the officer real-
ized that the handling of the knife was not proper and that its
integrity would come into question, hence the falsified report
that the knife was put into a proper brown evidence bag and not
an improper cardboard paper towel tube. Also clear from this rep-
ort is that the officer realized that the scene should have been
secured right away to preserve its integrity and falsified the re-
port to reflect that the reason he did not mark the so called br-
own evidence bag is because he was busy securing the scene and
looking for other evidence.

Many officers have admitted that the knife was not handled
properly from the time it was first found. In his supplemental re-
port the deputy states,"The knife was not secured properly when
turned over to Varnado," showing that it went through many hands
before it was finally handled properly.[55] Using this evidence from

-31-

this seasoned officer should have been introduced to bolster Petitioner's story regarding the knife.

Counsel was remiss in not pursuing this line of argument. His failure prejudiced Petitioner so greatly that it denied him any chance of a fair trial and a verdict worthy of confidence.

Based on the foregoing conviction and sentence Petitioner's conviction should be overturned.

## CONCLUSION

WHEREFORE, Petitioner prays that after careful consideration of the claims presented, supporting facts and law this Honorable Court Grant the Great Writ of Habeas Corpus in this case.

## CERTIFICATE OF SERVICE

I, Rondy Vernon, Sr., do hereby certify that a copy of the foregoing Great Writ of Habeas Corpus, has been mailed to the Hon. Walter P. Reed, D.A., Justice Center, 701 N. Columbia St., Covington, La. 70433, (985)809-8383.

Done this _05_ day of _OCTOBER_ ,2007.

_Rondy Vernon, Sr._
Rondy Vernon, Sr.

EXHIBITS FOR FEDERAL HABEAS CORPUS AND
STATE EXHIBITS ARE in REFERANCE TO
ONE ANOTHER

Exhibits to Supplemental Memorandon of Law in Support of Uniform
Application for Post Conviction Relief, State ex rel. Rondy Vernon,
Sr. v. N. Burl Cain, Warden, No.97-CR-467763, "F", 22nd Judicial
District Court, Parish of Washington, State of Louisiana.

Petitioner's Federal Habeas Corpus Exhibits are in referance to one
another with the States Exhibits.