# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**RONDY VERNON, SR.**                                    **CIVIL ACTION**

**La. DOC #93669**
**VERSUS**                                                **NO. 07-7608**

**BURL CAIN**                                             **SECTION A(4)**

## MEMORANDUM OF AUTHORITIES IN SUPPORT OF ANSWER TO APPLICATION FOR WRIT OF HABEAS CORPUS BY STATE PRISONER

May it Please the Court,

### PROCEDURAL HISTORY

Petitioner, Rondy Vernon, Sr., was charged by amended grand jury indictment with one count of second degree murder, a violation of La. R. S. 14:30.1. He pled not guilty. Following a trial by jury, he was found guilty as charged.  He moved for new trial and a post verdict judgment of acquittal, both of which were denied.  Petitioner was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Petitioner appealed to the First Circuit Court of Appeal. The Appeals Court affirmed the conviction and sentence. Petitioner then filed writs with the Louisiana Supreme Court, which were denied.

Petitioner later filed an application for post conviction relief with the trial court. This application was denied. Petitioner then filed writs to the First Circuit Court of Appeal and the Louisiana Supreme Court. All of these were denied.

### TIMELINESS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that a petitioner bring his claims for federal habeas corpus relief pursuant to 28 U.S.C. § 2254 within

one (1) year of the date on which the conviction or sentence became "final". Under AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.

Petitioner was found guilty of one count of second degree murder in violation of La. R.S. 14:30.1 on March 9, 2001.Petitioner appealed his conviction and sentence to the First Circuit Court of Appeal on September 5, 2001.(2001 KA 2104)

Petitioner's conviction and sentence were affirmed by the Louisiana First Circuit Court of Appeal on September 27, 2002. Petitioner's conviction and sentence would have become final ninety (90) days after the ruling by the First Circuit Court of Appeal on September 27, 2002. However, petitioner filed a writ application with the Louisiana Supreme Court seventy-six (76) days later on December 11, 2002.(2002 KO3011) This application was denied by the Supreme Court on September 19, 2003.  The petitioner's conviction and sentence became final ninety (90) days later, on December 18, 2003.

Two hundred fifty-seven (257) days tolled against petitioner before he filed his application for post conviction relief with the 22nd Judicial District Court, Parish of Washington, Louisiana on August 31, 2004. Petitioner filed a supplemental application for post conviction relief on June 23, 2005. The trial court denied post conviction relief on August 19, 2005.

One hundred thirty-two (132) days tolled against petitioner before any other filings were made. Petitioner did not file anything with the higher courts of Louisiana until December 29, 2005, when he filed a writ application with the Louisiana First Circuit Court of Appeal. (2005 KW 2727) This writ was denied on March 27, 2006.

Fifty-six (56) days tolled against petitioner before he filed a second writ application with the Louisiana First Circuit Court of Appeal on May 22, 2006. (2006 KW 1063) This writ application was denied on August 21, 2006.

Ninety-eight (98) days tolled against petitioner before he filed a writ application with the Louisiana Supreme Court on November 27, 2006. (2006 KH 2766). That writ was denied on September 14, 2007. Fifty-four (54) days then tolled against petitioner before he filed the instant application for Writ of Habeas Corpus on November 11, 2007.

All together, five hundred ninety-seven  (597) days tolled against petitioner before he filed the instant writ application. The instant writ of Habeas Corpus is not timely filed, as it was filed more than one year after the conviction and sentence became final.

### EXHAUSTION

Applicants seeking habeas corpus review are required to exhaust all claims in state court prior to requesting federal collateral relief. *Fisher v. Texas*,  169 F. 3d 295, 302 (5th Cir. 1999); *Whitehead v. Johnson*, 157 F. 3d 383, 387 (5th Cir. 1998). The exhaustion requirement is satisfied when the substance of the habeas claim has been fairly presented to the highest state court.  *Fisher*, 169 F.3d at 302, *Whitehead*, 157 F. 3d at 387. The exhaustion requirement has been met as to all the claims in the instant writ of habeas corpus.

### STANDARD OF REVIEW

The AEDPA comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254.  Amended subsections 2254 (d) (1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of fact and law. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254 (d) (1) and questions of fact are reviewed under §2254 (d) (2). *Hill v. Johnson*,  210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of fact and law, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S. C.§ 2254 (d) (1).  The United States Supreme Court has noted:

> §2254 (d) (1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, of if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular cases.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams v. Taylor*, 529 U.S. 362 (2000) that an unreasonable application is different from an incorrect one.

> *Bell v. Cone*, 535 U.S. 685, 694 (2002)

A federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S. C. § 2254 (d) (2);  *Hill v. Johnson*, 210 F.3d 481,485 (5th Cir. 2000) *cert. denied*. 532 U.S. 1039 (2001). Claim #1 below relative to the issue of missing transcripts set forth in the petitioner's instant writ application, has been previously visited by the First Circuit Court of Appeal and the Louisiana Supreme Court. As such, this writ presents repetitive applications for claims already presented to Louisiana's Supreme Court.

## FACTUAL BACKGROUND

On December 4, 1996, at 10:28 p.m., the victim, Edna McCain, clocked out from her job at K & S Conoco (herein after the business) in Franklinton, Louisiana. At closing time, the normal procedure was for the clerk to lock the door, do the paperwork, and take the night deposit to the bank or place it in a file cabinet or desk drawer.

When police began searching for the victim, they discovered a boning/skinning knife in the employee parking area of the business. The petitioner's car was discovered approximately 200-3000 yards from the business. The night deposit was not in the business, nor was it in the bank.

On December 6, 1996, a purse containing the victim's driver's license was discovered in El Paso, Texas. On December 7, 1996, the victim's body was discovered in the trunk of her car in El Paso, Texas. The petitioner's fingerprints were on the vehicle.

The victim died of hypothermia. She also suffered a 1.25 inch scratch under her right lower eyelid, bruising to her face, bruising on the inside of her mouth, bruises and scratches to her left knee and ankle, two .25 inch cuts to her right index finger, a .5 inch cut to the back of her hand, a 1.5 inch scratch to the left side of her neck, bruises to the back of her right leg, bruising to her left gluteal area, and bruising to her scalp.

Cheryl Warren, the petitioner's sister, received a phone call that did not properly connect from an unidentified caller in El Paso, Texas on December 6, 1996. On December 7, 1996, the petitioner called Ms. Warren from Albuquerque, New Mexico. He sounded scared and would not reveal his location. Ms. Warren informed the petitioner that the police were looking for him "[i]n connection with the lady." She also asked the petitioner to release the lady. The petitioner stated, "it may be too late."

On December 8, 1996, the petitioner gave the following account of events surrounding the victim's death to the FBI. On December 4, 1996, the petitioner went to a convenience store in Washington Parish to buy a pack of cigarettes. He had a kitchen knife with him. He saw a woman coming out of the store and decided to rob her. The woman struggled, the petitioner's hat came off and he dropped his knife. The petitioner believed the woman would recognize him, so he put her in her car and drove west. He needed to get gas along the way, but was afraid the

woman would yell, scream, or try to escape when he stopped for gas, so he put her in the trunk. He checked into a hotel/ motel in El Paso and called his sister. The next day he bought a bus ticket to Albuquerque. Before he left for Albuquerque, he told the victim to make noise so people would hear her and let her out of the trunk.

However, at trial, the petitioner claimed the FBI was lying about the confession, and gave the following account of the incident. The petitioner and the victim were very good friends. On December 4, 1996, while the petitioner was looking for his cousin, the petitioner came upon the victim crying in her car. The victim handed the petitioner a knife and asked him to cut her. The petitioner refused and threw the knife into the car. The petitioner subsequently became a passenger in the victim's car after the victim pleaded with him to ride with her to her sister's house in Kentwood, Louisiana. Thereafter, the petitioner began driving the victim because she was anxious and upset. On the way to Kentwood, the victim said she wanted to go to her sister's house in Shreveport and into Texas. The petitioner claimed the victim was upset because she heard "Vernon" was "messing with women up in Hackley." The petitioner also claimed that the victim told the petitioner that Vernon had snatched "the money" from her hand as she locked up the business and "backhanded" her in the mouth. According to the petitioner, it was the victim's idea to go into the trunk of her vehicle to avoid arrest for the missing money from the business. He claimed that he intended to let the victim out of the trunk after he rented the motel room, but fell asleep waiting for the area around the car to clear. The petitioner claimed that when he checked on the victim after waking up, she was not breathing.

**CLAIM #1**

Petitioner's first claim comes under the heading, "II Missing Transcript". (See page 9 of petitioner's memorandum herein) Petitioner claims that his "constitutional rights under the Due

Process Clause of the 14th Amendment to the United States Constitution was abridged because the government failed to provide new counsel on appeal with a significant portion of his transcript". Petitioner basically contends that he was not afforded full and fair appellate review because there was no transcript for his *Daubert* hearing. This claim was already brought on petitioner's original appeal to the First Circuit, and writs to the Louisiana Supreme Court. As a result, it is repetitive.

The Louisiana Supreme Court has ordered a new trial when material portions of the trial record were unavailable or incomplete. However, a slight inaccuracy in a record or an inconsequential omission from it, which is immaterial to a proper determination of the appeal, does not require reversal of a conviction. *State v. Brumfield,* 7373 So. So. 2d 660, 669 (La. 10/20/98) 92-2667, pp. 15-16, *cert denied*, 526 U.S. 1025, 119 S.Ct. 1267, 143 L. Ed 2d 362 (1999).

In the instant case, the minutes indicate, that on January 28, 1999, the trial court held a *Daubert* hearing and a hearing on a pro se motion for removal of counsel . (See Record, Vol. 1 of 8, page 17) The record also contains the affidavit of the court reporter present at the January 28, 1999 hearings, indicating that the records of the hearings were destroyed in a flood. (See Record, Vol. 8 of 8, page 1490)

The minutes concerning the *Daubert* hearing indicate the only witness who testified was State witness Tom Callaghan. The trial court accepted Callaghan as an expert in the field of DNA analysis and methodology, found all four requirements listed in the Daubert motion had been met[1], and ordered the scientific evidence admissible.

---

[1] Paragraph III of the *Daubert* motion set forth the factors a trial court should consider in deciding whether scientific evidence is reliable, to wit:
(1) The "testability" of the expert's theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;

Callaghan was called to testify by the State at trial. He performed or supervised DNA tests and serology tests in connection with the case against the petitioner. The polymerase chain reaction (PCR) DNA testing performed upon blood found on the handle of the knife found in the parking lot of the business and on two bloodstains found on the seats of the victim's vehicle excluded the petitioner as the source of the DNA on those items. However, the victim could not be excluded as the potential contributor of the DNA found on the knife and car seats. The probability of selecting an unrelated individual at random having the same DNA as detected in the specimens was one in 690 in the Caucasian population.

The motion for a *Daubert* hearing challenged the admissibility under *Daubert* of the State's DNA evidence concerning the blood on the knife. The defense presented no experts or other supporting evidence to rebut the State's expert's claims of admissibility under *Daubert* of the evidence in question. See, *State v. Hoffman*, 768 So. 2d 542, 566 (La. 2000) 98-3118, pp. 23-24, *cert denied*, 531 U.S. 946, 121 S. Ct. 345, 148 L. Ed 2d 277 (2000). Defense trial counsel is responsible for raising challenges to reliability of the methods used to analyze DNA evidence during the pretrial admissibility hearing.

On appeal, the petitioner argued that the missing *Daubert* transcript prejudiced his right to appellate review, but offered no argument for the inadmissibility of the evidence under *Daubert*. At trial, Callaghan testified that PCR DNA testing was performed on the knife.(See Record, Vol. 6 of 8, pages 1104- 1120, Vol. 7 of 8, pages 1121-1135 ) The Louisiana Supreme Court has held " PCR testing is a widely accepted scientific method of DNA testing, "citing federal case law holding PCR analysis to be reliable and admissible under *Daubert*. *State v. Cosey*, 779 So. 2d

---

(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community.
*State v. Quatrevingt*, 670 So. 2d 197 (La. 2/28/96), 93-1644, p.11, *cert denied*, 519 U.S. 927, 117 S. Ct. 294, 136 L. Ed. 2nd 213 (1996).

675, 682 (La. 2000) 97-2020, pp.9-10, *cert denied*, 533 U.S. 907, 121 S. Ct. 2252, 150 L. Ed. 2d 239 (2001)

After a thorough review of the record, the First Circuit Court of Appeal was convinced that the missing transcripts of the *Daubert* hearing were inconsequential in this case and immaterial to a proper determination of the Appeal. (See Record, Vol. 8 of 8, the opinion of the First Circuit Court of Appeal is loose in the back of this volume.)

Petitioner also argues that a Ms. Brown testified at the *Daubert* hearing, but the court reporter did not transcribe the tapes of her testimony concerning her testimony as an expert for the State. (See page 11 of petitioner's memorandum in the instant application) Petitioner does not provide any evidence that this occurred, and the minutes in the record do not support this argument.(See Record, Vol. 1 of 8, page 17)

Petitioner's arguments concerning the transcript of the *Daubert* hearing are without merit.

## CLAIM #2

Petitioner claims that the trial court did not have jurisdiction to hear this murder case. He states, " All of the substantive elements and aspects to the death of Ms. Edna McCain occurred in Texas." It is assumed that petitioner is attempting to argue that the venue for his trial for second-degree murder was improper in Washington Parish, and therefore the trial court lacked jurisdiction to try, convict and sentence him. Petitioner previously raised this issue in his application for post conviction relief to the trial court, which was also presented to the First Circuit Court of Appeal and the Louisiana Supreme Court. All of these were denied.

The locus delecti of a crime "must be determined from the nature of the crime alleged and the location of the act or acts constituting it". *Unites States v. Cabrales*, 574 U.S. 1, 118S. Ct. 1772, 141 L. Ed 2d 1 (1998); *State v. Hayes*, 837 So. 2d 1195 (La. 2003).

In Louisiana, the crime of second degree murder is broadly defined in La. R.S. 14:30.1(2)(a) as the killing of a human being: "When an offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or inflict great bodily harm."

Louisiana Code of Criminal Procedure, Article 611(A) provides, "All trials shall take place where the offense has been committed, unless the venue is changed. If acts constituting an offense or elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.

The jury in this case convicted petitioner of second degree murder. (See, Record, Vol. 4 of 8, page 550 ) The jury did not provide information as to what underlying crime or crimes they determined petitioner had committed. However, during the state's closing argument (See, Record, Vol 8 of 8, pages 1354-1357 ) the State's attorneys discussed the elements of second degree kidnapping, armed robbery, first degree robbery and simple robbery. (All of which are underlying crimes for the crime of second degree murder) They alleged that they had proven that Ms. Edna McCain had been robbed at knife point in the parking lot of the gas station/convenience store where she worked by petitioner. They also stated they had proved that the armed robbery turned into a kidnapping when petitioner forcibly secreted Ms. McCain away in her car using a weapon. As a result of petitioner's actions, Ms. Edna McCain died in the trunk

of her car. Obviously, the jury agreed with the state, because they found petitioner guilty of second degree murder.

It does not matter what underlying crime the jury based the second degree murder conviction on. Any of the crimes that would be considered the basis for second degree murder were perpetrated, at least in part,  in Franklinton , Washington Parish, Louisiana. Pursuant to Louisiana Code of Criminal Procedure Article 611, Washington Parish was the appropriate venue. This is where the court had jurisdiction over this murder case. This claim by petitioner is without merit.

## **<u>CLAIM #3</u>**

Petitioner has set forth an extensive list of mistakes he alleges were made by his trial counsel. Petitioner lists seventeen (17) separate claims of ineffective counsel. Due to the number of claims, and the page restriction, the responses to the various claims herein will be as brief as possible. All of these claims were brought in petitioner's application for post conviction relief, and have been presented to the First Circuit Court of Appeal and the Louisiana Supreme Court.

If petitioner did have a claim for ineffective assistance of counsel, which is denied,  it would need to be determined by the two pronged  test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 , 104 S. Ct 2052, 80 L. Ed. 2d 674 (1984). In order to make out a successful claim, the petitioner must demonstrate both (1) that his counsel's performance was deficient and (2) that the deficiency prejudiced the petitioner  by showing that counsel's errors were so serious as to deprive petitioner of a fair trial, a trial in which the result is reliable . Failure to establish either prong is fatal to the claim. *Strickland,* 466 U.S. at 687.  Such a claim requires that, but for counsel's error, the outcome of the trial would have been different. *State ex rel. Busby v. Butler*, 538 So. 2d 164 (La. 1988),  *State v. Wright*, 598 So. 2d 493 (2 Cir.

1992), *State v. Bouie*, 598 So. 2d 610 (4 Cir. 1992) It is unnecessary to address issues of both

counsel's performance and prejudice to the petitioner if the petitioner makes an inadequate

showing on one of the components. *State v. Serigny*, 610 So. 2d 857 (La. App. 1 Cir. 1992), writ

denied, 614 So. 2d 1263 (La. 1993).

In *Strickland*, supra., the court stated:

> Judicial scrutiny of counsel's performance must be highly
> deferential. It is all too tempting for a defendant to second guess
> counsel's assistance after conviction or adverse sentence, and it is
> all too easy for a court examining counsel's defense after it has
> proved unsuccessful, to conclude that particular act or omission of
> counsel was unreasonable. Cf. *Engle v. Isaac,* 456 U.S. 107, 102 S.
> Ct 1558, 71 L. Ed 783 (1982). A fair assessment of attorney
> performance requires every effort be made to eliminate the
> distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time. Because of the difficulties
> inherent in making the evaluation, the court must indulge a strong
> presumption that counsel's conduct falls within the wide range of
> professional assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged action
> "might be considered sound trial strategy." *Michel v. Louisiana,*
> [350 U.S. 91, 76 S. Ct 158].

a) Petitioner alleges that, Ms. Ginger Bickham , petitioner's ex- sister –in- law  "was not

competent to serve as a member of the Grand Jury", and that,  b) Ms. Bickham was "not

competent to serve as foreman of the Grand Jury. As a basis for these two claims, petitioner

argues that Ms. Bickham was a person, "with a high probability of harboring bad feelings and ill-

will towards him. (See petitioner's memorandum herein, page 18.) Petitioner also alleges that his

counsel should have investigated the composition of the grand jury.

The mere relationship between a juror and defendant is not in itself grounds for a

challenge for cause. *State v. Frost*, 727 So. 2d 417 (La. 1998), *rehearing denied, certiorari

denied,* 120 S. Ct. 87, 528 U.S. 831, 145 L. Ed. 2d 74. Petitioner has provided no evidence that

shows that Ms. Bickham was, in fact, his ex-sister-in-law, or that she would have been influenced by her relationship with petitioner. There is no proof that Ms. Bickham could not be fair while executing her duties as a grand juror or as the foreman of the grand jury. Petitioner has not shown that the presence of petitioner's ex-wife's sister on the grand jury influenced the verdict herein. As such, these claims are without merit.

c) Petitioner alleges that defense counsel, "failed to obtain a copy of Trinity Marine Products Security Log Book". He argues that the log book could be used to show that he was on his way to El Paso, Texas (another state) when the victim passed away. Therefore, the venue for this murder case was improper. Petitioner simply that the log book would prove petitioner did not enter the premises of Trinity Marine on December 5, 1996. Petitioner notes that Ms. Summer Arnold, in her statement to the FBI (See, Record, Vol 1 of 8, page 63 ) stated that petitioner was at Trinity Marine on December 5, 1996 to pick up his paycheck as proof of his claim. And, that this was incorrect. Apparently petitioner believes the security log for that day would contradict Ms. Arnold's statement. It is not exactly clear why this is relevant.

Whether or not petitioner picked up his paycheck on this date, the evidence is clear that petitioner had already robbed and absconded with Ms. McCain on that date. Petitioner's own statement to the FBI (See, Record, Vol 1 of 8, page 53 ) indicates that he robbed Ms. McCain on December 4,1996. He thereafter, left town with Ms. McCain in her car. ( Furthermore, petitioner noted that his mother went to pick up his paycheck. This is stated in a letter to his defense counsel dated May 5, 1998. (The letter is handwritten and attached to the memorandum filed with the instant writ application.) Petitioner was in another state when the victim died, but that is of no consequence in this instance. (See, Response to petitioner's claim #2 above)

It is completely irrelevant to the elements of second degree murder that the victim died while petitioner was in another state. Petitioner was still engaged in the perpetration of his crimes when the victim died. He was still on the run, part of the chain of his actions and crimes that started in Franklinton Louisiana, and led to the victim's death.

Petitioner's claim that his counsel's failure to obtain the log book was the reason he was unable to prove improper venue, is without merit. Petitioner also claims the Trinity Marine log book would show that the victim was with him voluntarily. Petitioner provides no explanation of how the security log book could show this. As such, this claim is totally without merit.

d) Petitioner alleges that defense counsel failed obtain records and receipts from the motel where he stayed in while in El Paso, Texas. Petitioner argues that if counsel had shown pictures of petitioner and the victim to people who worked at the motel, someone might have remembered seeing them together. This would have shown the victim was traveling with him willingly, which was petitioner's defense strategy at  trial. Petitioner provides no evidence that the victim was in fact, with him willingly, nor does he point to any witnesses who actually saw them together. Furthermore,  by petitioner's own admission, (See, Petitioner's Statement to the FBI, Record, Vol 1 of 8, page 54) the victim was locked in the trunk of her car at the time he checked in to the motel. This claim is without merit .

The next five (5) claims e-i), and claim (m)), involve allegations of counsel's failure to investigate. To prove this type of claim, petitioner must demonstrate that counsel's failure to investigate kept him from making an informed, tactical choice. Further, that knowledge of the uninvestigated evidence would have altered counsel's decision. *State v. Francis*, 809 So. 2d 1132 (4th Cir. 2002) The fact that an investigation would have turned up admissible evidence is, in itself insufficient to show prejudice to the petitioner. *Strickland*, supra. at 1262. The petitioner

must demonstrate that the basis of counsel's tactical choice would have been invalidated. In *Strickland*, the Court held that defendants should usually be required to show what evidence a reasonable investigation would have produced. *Id*, at 1262. In addition to proving counsel's shortcomings, petitioner must also show that counsel's failings "worked to his actual and substantial disadvantage." *Washington v. Strickland*, 693 F. 2d at 1258(quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596, 71 L. Ed 2d 816, 831 (1982))

e) Petitioner alleges that counsel failed to investigate whether there were eyewitnesses who could have identified the victim and petitioner as they traveled. Petitioner argues that these eyewitnesses would be able to prove that Ms. McCain was with petitioner willingly. This is a similar argument to the argument that perhaps someone at the motel in El Paso could have seen the petitioner and the victim together. There is absolutely no basis to believe that an eyewitness identification could be made. The possible eyewitnesses petitioner points to are people he saw in cars where he stopped and people working at gas stations. There would be no way to locate or identify these people for the purpose of an investigation. Further, they are not sufficiently identified.

Petitioner admitted to putting Ms. McCain in the trunk of her car, and not letting her out. (See, Petitioner's Statement to the FBI, Record, Vol 1 of 8, page 54) He later changed his story, stating that he and the victim were traveling together, and she was not in the trunk until she later decided to enter the trunk on her own. (See, letter to defense counsel dated May 5, 1998. The letter is handwritten and attached to the memorandum filed with the instant writ application.)

Where the only evidence of a missing witness's testimony is from the defendant, the courts have viewed claims of ineffective counsel with great caution. *United States v. Cockrell*, 720 F.

2d  1423, 1427, (5th Cir. 1983), *cert denied*, ____U.S.____, 104 S. Ct. 3534, 82 L. Ed. 2d 839 (1984).

    f) Petitioner alleges that defense counsel failed to investigate the relationship between the victim and Vernon Jenkins and the background of Vernon Jenkins. This is not true.

    Vernon Jenkins was the victim's boyfriend. Petitioner's story was that Mr. Jenkins had robbed the victim (presumably the night deposit that was missing on the night of December 4, 1996) and she didn't know what to do. So, she asked petitioner to drive her out of town, because she didn't want to turn Mr. Jenkins in to the police.

    Counsel actually presented testimony of a jailhouse buddy of petitioner's who stated that he had seen Mr. Jenkins carrying the night deposit bag on the night in question. This witness also testified about Mr. Jenkin's character, as he had been a neighbor of Mr. Jenkins' at one time.  He stated that Mr. Jenkins treated Ms. McCain "like a dog". (See Vol. 8 of 8, pages 1265-1270) And, that Mr. Jenkins was involved in drugs. This witness' credibility was obviously rejected by the jury.

    Although the account of events set forth by petitioner's jailhouse buddy comports with the story in petitioner's letter to his counsel dated May 5, 1998, it bears no relation  to petitioner's statement to the FBI. (See, Record, Vol 1 of 8, page 53). Petitioner has not pointed out any evidence which would be produced by more thorough investigation, much less that it would undermine confidence in the outcome of the trial herein. As such, it is without merit. *Berry v. King,* 765 F. 2d 451, 454, (5th Cir. 1985)

    g) Petitioner alleges that counsel failed to investigate other evidence found at the crime scene. (comb, lottery ticket, etc.)  There are many very good tactical reasons why counsel would not want to test and/or investigate the other items found at the crime scene. Testing these items

might connect petitioner to the crime. Petitioner admitted that he had lost his hat during his struggle with the victim at the crime scene. (See, Record, Vol. 1 of 8, page 53). Logically, he might have lost other items during the struggle as well.

Further, counsel hired a DNA expert to provide ideas for the defense. (See letter dated January 22, 1999 from Anne H. Montgomery, attached to the petitioner's memorandum herein) Although she was provided with a great deal of documentation, the DNA expert did not express the need for testing or investigating the comb, lottery ticket or hat. Obviously, these would not have been productive in the defense of the case.

Petitioner has not provided a basis to believe that this investigation would have led to anything exculpatory in his case, except to say that it "could have possibly pointed to someone else involved in this incident." This claim is without merit.

h) Petitioner alleges counsel failed to investigate the weather on the night of the crime. There was no disagreement in the testimony at trial that it rained at some time during the night of the incident. The exact time of the rainfall was not agreed upon by the detectives investigating the crime scene on the morning following the crime. Petitioner says the weather  played a crucial role in the integrity of the evidence, and therefore, counsel should have gotten the weather statistics for that night to " more effectively argue his case."

This allegation has no merit. There is no logical basis to believe that evidence of the timing of weather conditions could have changed the anything about the integrity of the evidence, or the outcome of this trial.

i) Petitioner alleges that counsel failed to investigate the relationship of petitioner and Ms. McCain. As stated above, petitioner changed his story after his confession to the FBI. This story involved the assertions that he and the victim had been intimately involved, that she had been

paying his bills, and having sex with him prior to the crime. Petitioner asserts that an investigation of their relationship would have shown that they "mutually left Franklinton together and that she was not kidnapped."

Defense counsel actually used the relationship of petitioner and the victim as a defense at trial. And, it was implied that the victim did go with petitioner voluntarily , in the defense's closing. (See, Record. Vol. 8 of 8, 1364-1378). Presumably, counsel did investigate this relationship, as it was part of the trial strategy. The jury did not find the defense credible.

j) Petitioner alleges counsel failed to hire an expert in the field of DNA technology. This is not true. Counsel consulted Anne Montgomery, M.S., relative to the DNA issues in this case. (See letter dated January 22, 1999 from Anne H. Montgomery, M.S., attached to the petitioner's memorandum herein). Petitioner alleges, based on Ms. Montgomery's letter (which indicates that the FBI did not test the victim's nail clippings), that counsel should have had the nail clipping of the victim tested to show that she was not involved in a struggle with petitioner.

There is independent evidence in the record that Ms. McCain was involved in a struggle with petitioner. See, the coroner's report and testimony. (Record, Vol. 2of 8, pages. 160-168, and Vol. 5of 8 pages 804-816) The victim had multiple cutaneous contusions and abrasions, and superficial wounds to her right hand. The nail clipping would not rule out a struggle.

k) Petitioner alleges counsel failed to hire an expert to "test the blood found on the knife and to dispute the statistical data of the State's expert." This is not true. Petitioner himself provided evidence of the fact that there "was no sample available for re-test by an independent laboratory." (See, letter dated January 22, 1999 from Anne H. Montgomery, M.S., paragraph 5., attached to the petitioner's memorandum herein).

l) Petitioner alleges that counsel failed to hire a forensic pathologist to determine the exact time of death. Petitioner does not show that the exact time of death would yield any  exculpatory evidence. Petitioner placed the victim in the trunk, and never let her out. As a result, she died of hypothermia. The victim died as a result of petitioner's actions. The time is irrelevant.

m) Petitioner alleges counsel failed " to investigate whether the victim appeared to have been in a struggle before going in trunk". (sic) The defense in this case was that the victim went with the petitioner willingly.( See, Record. Vol. 8 of 8, 1364-1378). It was the State who provided the evidence of the struggle, as it was their burden.(See, Record, Vol. 8 of 8, pages 1379-1386).

n) Petitioner alleges counsel failed "to challenge the expertise of State expert, Dr. Juan Contin". Dr. Contin was the coroner in El Paso, Texas. (See Record, Vol. 5 of 8, pages 802-830. Defense counsel stipulated to the expertise of the doctor, as he had very solid credentials.( See, Vol. 8of 8, pages 802- 803) There is nothing to suggest that challenging this doctor's credentials would have changed anything in the trial. Defense counsel vigorously cross-examined this witness, and attempted to elicit exculpatory evidence for petitioner. (Vol. 8 of 8, pages 816-825). This examination was not persuasive to the jury.

o)  Petitioner alleges counsel failed to "to challenge the alleged expertise of State expert, Dr. Callaghan." This is not true. Counsel did attempt to challenge this expert's expertise, but the trial court accepted him as an expert. (See Vol. 6 of 8, page 1104) Further, counsel was able to vigorously cross-examine this witness. (See Record, Vol. 6 of 8, pages 1102- 1120, Vol. 7 of 8, pages 1121-1135 )  This claim is totally without merit.

p) Petitioner alleges counsel told jurors "they were court appointed". Petitioner alleges this " made the jury look down on  defendant." Petitioner does not demonstrate why the jury would

have looked down on the petitioner for this reason, or that his trial was prejudiced on this basis.

q) Petitioner alleges that counsel failed "to properly challenge improper handling of knife and crime scene." This is not true. Counsel objected to the results regarding the knife on the basis that the chain of custody was not proper. (See, Record, Vol. 6 of 8, page 120) The trial court overruled this objection. Petitioner seems to believe that because it rained the night of the crime, the knife was tainted. Even if that were true, which is denied, there was no prejudice to petitioner. Dr. Callaghan testified that petitioner did not contribute DNA to the knife. (See Record, Vol. 6 of 8, page 1119). There was no DNA that tied petitioner to the knife.

## CONCLUSION

All of the arguments by petitioner herein are without merit.   The claim relative to the "missing transcripts" is without merit. The argument that the court did not have jurisdiction over this case is without merit. And, all seventeen allegations of ineffective assistance of counsel are without merit.

There is no need for a federal evidentiary hearing. The record in this case is sufficient for the determination of the issues presented in the instant writ.

Respectfully Submitted,


 "/s/" Patricia Nalley  Bowers

PATRICIA NALLEY BOWERS
Trial Attorney
Louisiana Bar Roll Number 3341

Special Counsel
District Attorney of Washington Parish

Bowers & Bowers
201 St. Charles Avenue
Suite 2505
New Orleans, LA 70170
(504) 522-3340
bowersfirm@hotmail.com

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that a copy of the foregoing has been served on the opposing party herein:

Rondy Vernon
# 93669
Camp C- Wolf 2
General Delivery
Louisiana State Penitentiary
Angola, Louisiana 70712

and the Louisiana Department of Justice , Office of the Attorney General, by placing same in the United States Mail, postage prepaid this  13th day of  February 2008,  and filed with the court by electronic transmission.