UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RONDY VERNON, SR.                                    CIVIL ACTION

VERSUS                                               NO.  07-7608

BURL CAIN (WARDEN) LA. STATE                         SECTION "A"(4)
PENITENTIARY

## SUPPLEMENTAL REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including

an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant

to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section

2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be

disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2).[1]

## I.   Procedural History of the Captioned Case

On December 8, 2010, the undersigned Magistrate Judge issued a Report and

Recommendation addressing the federal habeas corpus petition filed by Rondy Vernon, Sr.

---

[1]Under 28 U.S.C. § 2254(e)(2), an Evidentiary Hearing is held only when the petitioner shows that either the
claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could
not have been previously discovered by exercise of due diligence and the facts underlying the claim show by clear and
convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

("Vernon").[2]  In that report, the Court addressed the  State's limitations defense and recommended that the petition be dismissed with prejudice as time-barred.

After considering Vernon's objections and his newly disclosed information not previously presented to the undersigned,[3] the District Judge issued an Order and Reasons granting Vernon equitable tolling which rendered his petition timely filed.[4]  The District Judge also referred the matter back to the undersigned to address the merits of Vernon's claims.  This supplemental report is in response to the District Court's referral.

## II.    State Court Factual and Procedural Background

Vernon is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[5]  On January 24, 1997, Vernon was indicted by a Grand Jury in Washington Parish for the first degree murder of Edna McCain.[6]  The indictment was later amended on March 5, 2001, to charge Vernon with second degree murder.[7]

The record reflects that, on December 4, 1996, at 10:28 p.m., Edna McCain clocked out from her job at K&S Conoco, a local convenience store, in Franklinton, Louisiana.[8]  At closing time, the normal procedure was for the clerk to lock the door, do the paperwork, and take the night deposit

---

[2]Rec. Doc. No. 13.

[3]Rec. Doc. No. 14.

[4]Rec. Doc. No. 15.

[5]Rec. Doc. No. 1, Petition.

[6]St. Rec. Vol. 2 of 9, Indictment, 1/24/97.

[7]Id., Amended Indictment, 3/5/01.

[8]These facts were taken from the unpublished opinion of the Louisiana First Circuit Court of Appeal on direct appeal.  St. Rec. Vol. 4 of 9, 1st Cir. Opinion, 2001-KA-2104, pp. 2-4, 9/27/02.

to the bank or place it in a file cabinet or desk drawer.  McCain did not return home from work that night.  As a result, her boyfriend, Vernon Jenkins, called the police regarding her disappearance.

While searching for McCain, who went missing that night, the police discovered a boning or skinning knife in the employee parking area at the Conoco.  They also found her vehicle about 200 to 300 yards from the convenience store.  The night deposit was not found.

On December 6, 1996, a purse containing McCain's driver's license was discovered in El Paso, Texas.  The next day, McCain's body was discovered in the trunk of a car in El Paso.  Vernon's fingerprints were on the vehicle.  The coroner determined that McCain died of hypothermia.  She also had a 1.25 inch scratch under her right eyelid and bruising to her face and the inside of her mouth.  She also had bruising and scratches to her left knee and ankle.  She suffered two .25 inch cuts to her right index finger, a .5 inch cut to the back of her right hand, and a 1.5 inch scratch to the left side of her neck.  She also suffered bruising to the back of her right leg, her left gluteal area, and her scalp.

Vernon's sister, Cheryl Warren, received a failed telephone call from an unidentified caller in El Paso, Texas on December 6, 1996.  The next day, she received a call from Vernon from Albuquerque, New Mexico.  Warren testified that Vernon sounded scared and would not tell her his location.  She told him to turn himself in because the police were looking for him in connection with McCain's disappearance.  She also told him he should release McCain, and Vernon replied that it may be too late.

On December 8, 1996, Vernon spoke to the FBI and gave the following account of the events.  On December 4, 1996, he went to a convenience store in Washington Parish to buy some cigarettes.  He had a kitchen knife with him.  He saw a woman coming out of the store, and he decided to rob her.  The woman struggled and he dropped his hat and the knife.  Because she could

3

recognize him, he put her in the car and drove off with her.  He needed gas, but he was afraid the woman would yell, scream, or try to escape, so he put her in the trunk.  He checked into a motel in El Paso and called his sister.  The next day, he bought a bus ticket to Albuquerque.  Before he left, he told McCain to make noise so people would hear her to let her out of the trunk.  Vernon denied the truth of this confession at trial.

At trial, Vernon testified differently than his statement.  He testified that, while he was looking for a telephone to use, he saw McCain sitting in her car as she was leaving work on December 4, 1996.[9]  She was upset and crying, and at one point asked him to cut her with a knife she had.[10]  He refused and she eventually asked him to ride with her to her sister's house.  They talked about her personal life and drove for hours.[11]  They made several stops along the way for gas and cigarettes for which McCain paid.  Vernon drove for a while.  She also told him that her fiancé, Vernon Jenkins, had taken the money from the gas stations and she was scared to turn him in or to be arrested herself.[12]  They stopped near El Paso, Texas, and she decided to hide in the trunk so she would not be seen in the car.[13]  He testified that he eventually stopped at a motel in El Paso and checked into a room using $100 McCain gave him.[14]

---

[9]St. Rec. Vol. 3 of 9, Trial Transcript, pp. 143, 147-49, 3/8/01.

[10]*Id*., p. 149.

[11]*Id*., pp. 149-163.

[12]*Id*., pp. 162-63.

[13]*Id*., p. 163.

[14]*Id*., p. 164.

He parked the car near the room and opened it up by turning on the television and opening the blinds.[15] He went to the car and told McCain that there were too many people around for him to let her out.[16] It was still daylight, around 4:30 p.m. or 5:00 p.m.[17] He went back to the room and fell asleep.[18] When he awakened, he immediately went to the car and found McCain lifeless in the trunk.[19] He tried to run away but returned to the hotel. This is when he unsuccessfully called his sister for the first time at around 3:00 a.m.[20] He then checked out of the hotel, drove the car to the bus station and left for Albuquerque.[21] In connection with McCain's purse found elsewhere in El Paso, he further testified that he left the keys in the car and the doors unlocked.[22]

Vernon was tried before a jury on March 5 through 9, 2001, and he was found guilty as charged of second degree murder.[23] At a hearing held on March 15, 2001, the Trial Court denied Vernon's motions for new trial and for post-verdict judgment of acquittal.[24] After waiver of legal

---

[15]*Id.*, p. 166.

[16]*Id.*

[17]*Id.*, p. 167.

[18]*Id.*

[19]*Id.*

[20]*Id.*, pp. 167-68.

[21]*Id.*, pp. 168-73.

[22]*Id.*, pp. 173-74.

[23]St. Rec. Vol. 2 of 9, Trial Minutes, 3/5/01; Trial Minutes, 3/6/01; Trial Minutes, 3/7/01; Trial Minutes, 3/8/01; Trial Minutes, 3/9/01; St. Rec. Vol. 3 of 9, Trial Transcript (continued), 3/7/01; Trial Transcript, 3/8/01; Trial Transcript, 3/9/01; St. Rec. Vol. 5 of 9, Trial Transcript, 3/5/01; St. Rec. Vol. 6 of 9, Trial Transcript (continued), 3/5/01; Trial Transcript, 3/6/01; St. Rec. Vol. 7 of 9, Trial Transcript (continued), 3/6/01; Trial Transcript, 3/7/01.

[24]St. Rec. Vol. 2 of 9, Sentencing Minutes, 3/15/01; St. Rec. Vol. 3 of 9, Sentencing Transcript, 3/15/01.

delays, the Trial Court sentenced Vernon to serve life in prison without benefit of parole, probation, or suspension of sentence.[25]

On direct appeal, Vernon's appointed counsel raised two assignments of error:[26] (1) the Trial Court erred in denying the motion for change of venue based on pretrial publicity; and (2) he was denied full appellate review, because of the missing transcript of the *Daubert*[27] hearing.   On September 27, 2002, the Louisiana First Circuit Court of Appeal denied relief finding no merit in either of the claims.[28]

The Louisiana Supreme Court also denied Vernon's timely-filed writ application without reasons on September 19, 2003.[29]   Vernon's conviction became final 90 days later, on December 18, 2003.   *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S.Ct. Rule 13(1).

On August 30, 2004, Vernon submitted an application for post-conviction relief to the Trial Court.[30]   As relief, Vernon requested that the Trial Court issue an order compelling the district

---

[25]*Id.*

[26]St. Rec. Vol. 4 of 9, 1st Cir. Opinion, 2001-KA-2104, 9/27/02; Appeal Brief, 2001-KA-2104 (undated).

[27]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[28]*Id.*

[29]*State v. Owens*, 853 So.2d 632 (La. 2003); St. Rec. Vol. 4 of 9, La. S. Ct. Order, 2002-KO-3011, 9/19/03; La. S. Ct. Letter, 2002-KO-3011, 12/11/02 (showing postmark of 10/17/02); La. S. Ct. Writ Application, undated copy.

[30]St. Rec. Vol. 1 of 9, Uniform Application for Post-Conviction Relief, signature dated 8/30/04; Rec. Doc. No. 1-2, p. 11, Certified Mail Receipt date 8/30/04.  Although the petition does not bear a file-stamp date, Vernon's signature date is considered to be the filing date under the applicable mailbox rule.

attorney's office to turn-over its files to him so that he could later file a thorough application for post-conviction relief.  The Trial Court denied his request as moot on September 28, 2004.[31]

On June 17, 2005, Vernon submitted to the Trial Court a proposed supplemental brief to be filed in support of his prior application for post-conviction relief.[32]  He raised nine claims in this supplemental memorandum: (1) improper venue based on the location of the victim's death; (2) invalid indictment; (3) double jeopardy and denial of due process; (4) that the indictment failed to inform him of the specifics of the charge; (5) that the trial court's errors violated his rights; (6) prosecutorial misconduct; (7) police misconduct; (8) ineffective assistance of counsel; and (9) that the cumulative errors violated due process.  Although Vernon claims to have received an order dated August 19, 2005, denying his request to supplement, and the State claims to have sent such an order, the order does not appear in the record provided to this Court.[33]  Furthermore, neither Vernon nor the State has provided this Court with a copy of any such order.  Nevertheless, the record contains a motion, submitted on October 27, 2005, from Vernon seeking an order to compel the district attorney to answer his supplemental claims.[34]  This motion was denied by the Trial Court on November 10, 2005.

---

[31] St. Rec. Vol. 1 of 9, Trial Court Order, 9/28/04.

[32] St. Rec. Vol. 1 of 9, Supplement to Pending Application for Post-Conviction Relief, 6/23/05.

[33] *See* Rec. Doc. No. 1-2, p. 2, Memorandum in Support, and Rec. Doc. No. 12, p. 2, Opposition Memorandum.

[34] St. Rec. Vol. 1 of 9, Motion to Compel Answer, 11/3/05 (dated 10/27/05).

On November 11, 2005,[35] Vernon submitted a writ application to the Louisiana First Circuit in which he requested an extension of time to file a writ and to exceed page limits.[36]  By order issued March 27, 2006, the Court granted the extension of time, but denied the request to exceed page limits.[37]  In addition, the Court denied the writ application finding that Vernon had failed to comply with the procedural requirements to provide the necessary documents for the Court's review.  The Court instructed him to submit a proper application by May 22, 2006.

In the meantime, Vernon submitted a letter to the Trial Court dated March 30, 2006, in which he requested the Court to rule on his original and supplemental post-conviction memoranda.[38]  The request was denied by the Trial Court on August 10, 2006.[39]

While that was being addressed, on May 19, 2006, Vernon submitted another writ application to the Louisiana First Circuit.[40]  On August 21, 2006, the Court denied the application because Vernon failed to comply with the Court's prior ruling on March 27, 2006.[41]

Vernon submitted a writ application to the Louisiana Supreme Court on September 20, 2006, arguing that the trial court erred in denying his application for post-conviction relief without an

---

[35]Since the State failed to produce a copy of this writ application, the submission date is taken from Vernon's pleadings.  Rec. Doc. No. 1-2, p. 3, Memorandum in Support.  The State does not suggest any other submission date for purposes of applying the applicable mailbox rule.

[36]The State failed to produce a copy of this writ application.

[37]Rec. Doc. No. 1-2, p. 9, 1st Cir. Order, 2005-KW-2727, 3/27/06.

[38]St. Rec. Vol. 1 of 9, Letter to Trial Court, 4/6/06 (dated 3/30/06).

[39]St. Rec. Vol. 1 of 9, Trial Court Order, 8/10/06.

[40]Rec. Doc. No. 1-2, p. 7, Inmate's Request for Legal/Indigent Mail, 5/19/06.  The State failed to produce a copy of this writ application.

[41]Rec. Doc. No. 1-2, p. 6, 1st Cir. Order, 2006-KW-1063, 8/21/06.

evidentiary hearing, and the appellate court erred in refusing to consider his application to that Court.[42]  On September 14, 2007, the Court denied the application without stated reasons.[43]

### III.   **Federal Petition**

On November 7, 2007, the clerk of this Court filed Vernon's petition for federal habeas corpus relief, in which he raised three claims:[44] (1) the missing *Daubert* transcript denied him appellate review; (2) the Trial Court lacked subject matter jurisdiction over his trial because it was an improper venue; and (3)(A) counsel provided ineffective assistance where he failed to investigate in the following ways:  (a) failed to investigate competence of the grand jurors; (b) failed to obtain a copy of Trinity Marine Products Security log book; (c) failed to obtain motel records and receipts; (d) failed to investigate whether there were eyewitnesses who could have identified him and McCain as they traveled; (e) failed to investigate the relationship between McCain and Vernon Jenkins; (f) failed to investigate other evidence found at the crime scene; (g) failed to investigate the weather on the night of the crime; and (h) failed to investigate the relationship between Vernon and McCain; (3)(B) counsel provided ineffective assistance where he failed to hire an expert in the field of DNA to test the blood found on the knife; (3)(C) counsel provided ineffective assistance where he failed to hire an expert in the field of forensic pathology to investigate the cause of death and whether there was a struggle before McCain went into the trunk; (3)(D) counsel provided ineffective assistance where he failed to challenge the expertise of Dr. Juan Contin as an expert in forensic pathology; (3)(E) counsel provided ineffective assistance where he failed to challenge the expertise of Dr. Tom Callaghan; (3)(F) counsel provided ineffective assistance where he told prospective jurors during

---

[42]St. Rec. Vol. 1 of 9, La. S. Ct. Writ Application, 06-KH-2766, 11/28/06 (dated 9/20/06).

[43]*State ex rel. Vernon v. State*, 963 So.2d 393 (La. 2007).

[44]Rec. Doc. No. 1.

voir dire that they were court appointed; and (3)(G) counsel provided ineffective assistance where he failed to challenge the improper handling of the knife and crime scene.

The State filed an answer and memorandum in opposition to Vernon's petition arguing that Vernon's petition was not timely filed.[45]  Citing mostly state law irrelevant to this Court's federal review, the State also argues that Vernon's claims are without merit.

## IV.   <u>General Standards of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[46] applies to this petition, which is deemed filed in this Court under the federal mailbox rule on October 19, 2007.[47]  The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

---

[45]Rec. Doc. No. 12.

[46]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[47]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  The clerk of court filed Vernon's federal habeas petition on November 7, 2007, when the filing fee was paid.  Vernon did not date his signature on the petition itself. He did, however, date the cover letter submitted with the petition on October 19, 2007.  This is the earliest date on which he could have delivered the packet of papers to prison officials for mailing.  The fact that he later paid the filing fee does not alter the application of the federal mailbox rule to his pro se petition.  *See Cousin v. Lensing*, 310 F.3d 843, (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 374).

Contrary to the State's suggestion, the record does not support a finding that Vernon has exhausted state court remedies on all of the claims raised in this application.  While the *Daubert* transcript issue was raised by counsel on direct appeal, the improper venue based on the location of McCain's death and the ineffective assistance of counsel claims were raised by Vernon pro se in his supplemental post-conviction brief which was never considered by the state trial court nor were the claims raised therein specifically and properly raised in or through to the Louisiana Supreme Court. Nevertheless, because the ineffective assistance of counsel claims are without merit and because the matter has been re-referred for assessment of the merits, the Court will overlook the failure to exhaust and proceed to address the merits.  *See* 28 U.S.C. § 2254(b)(2).

## V.    <u>Standards of a Merits Review</u>

### A.    <u>Claims Addressed on the Merits by the State Courts</u>

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000).  It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *cf. Wright v. West*, 505 U.S. 277, 304 (1992). The court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *See, e.g., id.* at 305; *see also Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir. 2000), *cert. denied*, 531 U.S. 1002 (2000). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).

### B.    Claims Not Addressed on the Merits by the State Courts

The AEDPA's deferential standard of review applies only to claims adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d). As mentioned previously, Vernon's improper venue and ineffective assistance of counsel claims were not addressed by the state courts. With respect to claims that are not adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply. *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003). Instead, the federal courts review those claims under the pre-AEDPA *de novo* standards of review. *Id.*, at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying *de novo* standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); *see also*, *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009). Because Vernon's improper venue and ineffective assistance of counsel claim were not addressed by the state courts, this Court will consider the claims *de novo*.

VI.    **Analysis**

A.    **Missing *Daubert* Transcript**

Vernon claims he was denied adequate appellate review, because his appointed appellate counsel was not provided with a transcript of the *Daubert* hearing held on January 28, 1999, which led to a decision to admit the DNA evidence at trial.   Vernon argues that the DNA evidence presented by Dr. Tom Callaghan was crucial in resolving the question as to whether McCain voluntarily traveled with him and voluntarily entered the trunk where she died.

Vernon's counsel in fact raised this claim on direct appeal arguing that the inability to review the transcript was prejudicial in light of the importance of the DNA evidence of the victim's blood on the knife and in the car.   The Louisiana First Circuit noted that the court reporter's notes from the hearing had been lost in a flood.[48]   The Court reviewed the minutes from the *Daubert* hearing at which the Trial Court accepted Dr. Callaghan as an expert in the field of DNA analysis and methodology and found that the four reliability factors in *Daubert* had been met, and indicated that the evidence was admissible at trial.[49]   The Court resolved that the transcript was inconsequential to the case and immaterial to a proper determination of the appeal.[50]   The Court noted that the purpose of the hearing was to determine the admissibility of the DNA evidence regarding the blood samples and that the defense had offered no contrary expert evidence or other challenge to the admissibility of the evidence under *Daubert*.   For these reasons, the Court found the claim to be without merit.   This was the last reasoned opinion on the issue.

---

[48]St. Rec. Vol. 4 of 9, 1st Cir. Opinion, 2001-KA-2104, p. 6, 9/27/02.

[49]*Id*., p. 7; St. Rec. Vol. 1 of 9, *Daubert* Hearing Minutes, 1/29/99.

[50]*Id*., p. 8.

The Supreme Court long has recognized that an indigent defendant is entitled to a free copy of transcripts of the criminal proceedings in order to have a meaningful appeal. *Hardy v. United States*, 375 U.S. 277 (1964). However, the State is not "obligated to automatically supply a complete verbatim transcript," *Moore v. Wainwright*, 633 F.2d 406, 408 (5th Cir.1980), and a state need not waste its funds providing for free those parts of the transcript that are not "germane to consideration of the appeal." *Draper v. Washington*, 372 U.S. 487, 495 (1963).

Louisiana law complies with these constitutional standards. Appellate review in Louisiana is restricted to questions of law based on defense objections and assignment of errors preserved for appeal. *State v. Francis*, 345 So.2d 1120, 1125 (La.) (citing La. Const. Art. 5, § 5(C) (1974) and La. Code Crim. P. art. 841), *cert. denied*, 434 U.S. 891 (1977). Thus, when the transcripts and record contain the portions necessary to address the issues actually raised on appeal, including those portions where objections were made by counsel, the record is constitutionally sufficient for a meaningful appeal. *Schwander v. Blackburn*, 750 F.2d 494 (5th Cir. 1985).

Vernon complains that his appellate counsel was unable to review the transcript of the *Daubert* hearing to search for possible errors that could have been raised on appeal. It is well settled that the State is not "required to furnish complete transcripts so that the defendants . . . may conduct 'fishing expeditions' to seek out possible errors at trial." *Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir. 1982). As discussed by the Louisiana First Circuit, at no time did Vernon or his appellate counsel identify any suspected error in the Trial Court's ruling at the *Daubert* hearing or in any way suggest that the DNA evidence was inadmissible. The law also does not require a more complete transcript where the petition is completely unable "to indicate one specific error committed during

the portions of trial not included in the record." cf., *United States v. Renton*, 700 F.2d 154, 159 (5th Cir. 1983).

The record in this case was deemed sufficient for the state courts to review Vernon's appeal. In addition, the trial transcript includes a rehash of Dr. Callaghan's curriculum vitae and the basis for and methods used to assess the DNA from the blood samples found on the knife and in the car.[51] Any questions as to the compliance with *Daubert* could have been ascertained from the trial transcript.  Vernon has not pointed to anything in that transcript that would have raised a question as to the assessment made under *Daubert*.

To warrant federal habeas corpus relief on a claim that state court transcripts were unconstitutionally incomplete, the petitioner must support his claims with more than mere unsubstantiated, transparent speculation.  *See Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir.1987); *United States ex. rel. Hunter v. Follette*, 307 F. Supp. 1023, 1025 (S.D.N.Y.) ("general assertion that omitted portions of the record 'contained most of the . . . trial errors which are reversible,' presents no ground for federal habeas corpus."), *aff'd*, 420 F.2d 779 (2d Cir.1969), *cert. denied*, 397 U.S. 1067 (1970).  For the foregoing reasons, Vernon has not met this burden.

The denial of relief on this claim was not contrary to, or an unreasonable application of, federal law.  Vernon is not entitled to relief on this claim.

### B.    Louisiana Court was an Improper Venue

Vernon alleges that the State of Louisiana did not have subject matter jurisdiction since it was not a proper venue for his trial.  He alleges that the substantive elements of the murder and McCain's death occurred in Texas.  He argues that the timing of the travels to Texas would indicate

---

[51]St. Rec. Vol. 7 of 9, Trial Transcript, pp. 124-142, 3/7/11; St. Rec. Vol. 3 of 9, Trial Transcript (continued), pp. 143-150, 3/7/01.

that McCain died in Texas and the armed robbery and kidnapping in Louisiana were not determinative of venue. This claim was raised in Vernon's supplemental application for post-conviction relief, which was not filed or considered by the state courts.

In Louisiana, the issues of jurisdiction and venue are intertwined. The Louisiana Constitution provides that the state district courts have exclusive original jurisdiction over felony cases. La. Const. art. V, § 16(A)(2). The state constitution likewise provides, as it did when Vernon was charged, that "[e]very person charged with a crime . . . is entitled to a speedy, public, and impartial trial *in the parish where the offense or an element of the offense occurred*, unless venue is changed in accordance with law." La. Const. art. I, § 16 (emphasis added). Therefore, in Louisiana, "[v]enue is jurisdictional in criminal cases." *State v. Burnett*, 768 So.2d 783, 789 (La. App. 2nd Cir. 2000); *see also*, La. Code Crim. P. art. 615.

At the time, Louisiana law also provided as follows for determining venue where an offense occurred in more than one place:

> All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.

La. Code Crim. P. art. 611 (West 2003).[52]

In addition, where an offense is committed "on a train, vessel, aircraft, or other public or private vehicle while in transit in this state and the exact place of the offense in this state cannot be established, the offense is deemed to have been committed in any parish through or over which the train, vessel, aircraft, or other vehicle passed, and in which the crime could have been committed."

---

[52]This provision was later amended in 2004 to set the venue in the parish where the body was found when it could not be determined where a first or second degree murder may have occurred.

La. Code Crim. P. art. 612.  When venue is questioned in a criminal case prior to trial, the State bears the burden of proving proper venue by a preponderance of the evidence.  La. Code Crim. P. art. 615.

In Vernon's case, the evidence established that Vernon robbed and, using her car, kidnapped McCain at knife point from her place of employment in Franklinton, Louisiana in Washington Parish, where he was indicted.  As Vernon concedes, their traverse to Texas began in Washington Parish.  The search for them ended after he called his sister from Texas and officers located McCain's body in the trunk of the car where he left it in Texas.  The forensic evidence and the experts did not provide the specific location where McCain died of hypothermia; however, Vernon had already told police that she died in the trunk at the motel in El Paso.

Contrary to Vernon's suggestion, these events were part of the offense of second degree murder with which he was ultimately tried.[53]  Whether the conviction was based on his intent to let her die in the trunk of that car or because the related armed robbery and kidnapping forming the basis of the murder charge began in Franklinton, the record is certain that the offense or matters

---

[53]At the time, second degree murder was defined at La. Rev. Stat. Ann. § 14:30.1 as follows:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.

(3) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I or II of the Uniform Controlled Dangerous Substances Law, which is the direct cause of the death of the recipient who ingested or consumed the controlled dangerous substance.

(4) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I or II of the Uniform Controlled Dangerous Substances Law, to another who subsequently distributes or dispenses such controlled dangerous substance which is the direct cause of the death of the person who ingested or consumed the controlled dangerous substance.

B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

forming the basis of the murder occurred in Washington Parish, which also was the last place McCain was seen alive on the surveillance tape. Louisiana law therefore allowed for Washington Parish to be a proper venue for Vernon's murder charge and trial.

A review of the record and the applicable law renders Vernon's claim meritless. He has not established that venue was improper and therefore has not established that the Trial Court was without subject matter jurisdiction over his trial. Having failed to show some error in his trial, he has failed to establish a basis for federal habeas corpus relief.

### C.    Ineffective Assistance of Counsel

Vernon claims that his counsel gave ineffective assistance on several grounds to be addressed in this report. He raised these claims in the supplemental application for post-conviction relief, which was not filed or considered by the state courts.

The appropriate standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom. *See Strickland*, 466 U.S. at 697. The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992). In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88; *Cantu v. Thaler*, 632 F.3d 157, 163 (5th Cir. 2011). The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 787 (2011) (citing *Strickland*, 466 U.S. at 689).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695). In this context, "'a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at. 694. This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 131 S. Ct. at 791.

20

In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)), *cert. denied*, 531 U.S. 849 (2000).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 131 S.Ct. at 788. The *Harrington* Court went on to recognize that "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Harrington*, 131 S. Ct. at 788.

### 1.   <u>Failure to Investigate</u>

Vernon alleges that his counsel failed to investigate numerous matters before proceeding to trial. To be successful under *Strickland*, a petitioner "'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). Under this standard, each of Vernon's claims will be addressed separately.

### a.   <u>Failed to Investigate Competence of the Grand Jurors</u>

Vernon claims that his counsel was ineffective for failure to investigate the backgrounds of the members of the grand jury that indicted him to uncover possible irregularities. The Court first

notes that this overly broad and vague suggestion that counsel should have hunted for possible problems is not sufficient to establish unreasonable performance.

Vernon more specifically indicates that his former sister-in-law, Ginger Bickham, was a member of the grand jury and served as the foreperson when he was indicted. While he contends that the indictment appears to have been signed by a foreperson named "Singer" Bickham, he claims that the name was really Ginger Bickham, who was his former sister-in-law.[54]

He also argues that he divorced his ex-wife one month before Bickham served on the grand jury as foreperson. He contends that Bickham may have harbored ill-will against him as a result of the divorce which may have influenced the indictment. He suggests that his counsel should have discovered this possible point of bias and prejudice against him and moved to quash the indictment. Vernon claims that he was prejudiced by her presence on the panel and that she was not qualified to be on the panel under La. Code Crim. P. arts. 401 and 787, which set the basis for dismissal of petit jurors for cause and for incompetence.

Vernon has not pointed to and this Court has located no professional requirement that counsel investigate the composition of the grand jury where no concern is obvious from the record. Initially, Vernon has presented nothing to support his suggestion that the grand jury foreperson who signed the indictment was in fact his ex-sister-in-law. Next, Vernon himself concedes that the alleged problem with the identity of the grand jury foreperson as his alleged ex-sister-in-law was not readily discernable from the record or the reading of the indictment.

Even if counsel should have taken some action to assure the competence of each grand juror, Vernon has not established any prejudice from the indictment as passed with his alleged ex-sister-in-

---

[54]*See* Rec. Doc. No. 1-3, p. 22.

law as foreperson.  Once the indictment was issued, under Louisiana law, counsel would have had

to file a pretrial motion to quash the indictment to bring out any defects in the grand jury or the

indictment itself.  *Williams v. Cain*, 125 F.3d 269, 274 (5th Cir. 1997) ("It is undisputable that under

Louisiana law, a challenge to the legality of the grand jury venire must be made by a pretrial motion

to quash.").  If any bias or impropriety was proven via the motion, the state court would have

dismissed the indictment.  In light of the strong evidence against Vernon, the State would have

undoubtedly sought and obtained a new indictment to pursue the murder charge.  Vernon has made

no showing that, under that new indictment, the results of his trial would have been any different.

*Brown v. Cain*, 337 F.3d 546, 550 n. 5 (5th Cir. 2003), *cert. denied*, 540 U.S. 117 (2004); *Pickney

v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003) ("[W]e have no doubt that, if [petitioner] had been

successful in having his indictment quashed, the State of Louisiana would have sought and obtained

a second indictment"); *Phillips v. Cain*, No. 07-9730, 2010 WL 5636230, at *8 (E.D. La. Oct. 6,

2010), report and recommendation adopted, 2011 WL 294291, at *1 (E.D. La. Jan. 21, 2011).

For these reasons, Vernon has failed to establish that he was denied effective assistance of

counsel under the *Strickland* standard.

### b.      Failed to Obtain a Copy of the Security Log Book

Under a broad reading Vernon alleges that his counsel should have obtained copies of the

security logs from his employer, Trinity Marine Products, to contradict the testimony of Summer

Arnold Sharp (referred to as Ms. Arnold by Vernon) who placed him at Trinity Marine.  He claims

that this would have supported his defense that he was on his way to El Paso, Texas or in another

state, when McCain died and that McCain was voluntarily with him.  He also claims that this would

have reenforced that Louisiana was not an appropriate venue for his trial.

Even under a broad reading, the point of Vernon's argument here is unclear.  The Court is unsure whether Vernon is suggesting that he had already driven to Texas with McCain at the time he was supposed to be at the shipyard.  Assuming so, as noted by the State, the record is undisputed that by that time, he had already robbed and absconded with McCain.  As Vernon argued in his memorandum, it takes less than 17 hours to drive from Franklinton, Louisiana to El Paso, Texas.[55] From Madisonville, Louisiana, the drive is less than 16 hours.[56]  The evidence at trial, and Vernon's own confession, demonstrated that he arrived with McCain in El Paso, Texas on December 6, 1996, shortly before he tried to call his sister.

His first failed call to his sister from El Paso, Texas was received by her on December 6, 1996, at 3:12 a.m.[57]  This was about fourteen hours after he was supposed to have picked up his check, according to Arnold-Sharp.  She testified at trial for the State that she had seen Vernon at Trinity Marine in Madisonville on December 5, 1996 at around 1:00 p.m. when he picked up his paycheck.[58]  She also testified that Vernon had called to report himself sick on December 4 and 5, 1996.  He told her that he wanted to pick up his paycheck to pay for medicine.

Vernon suggests that a perusal of the logs, or interview of the security personnel, would have shown that he was not at Trinity Marine as Arnold-Sharp suggested.  Having reviewed the record, any further clarity to Arnold-Sharp's testimony only would have served to verify that Vernon arrived

---

[55]Rec. Doc. No. 1-2, p. 13; *see also*, St. Rec. Vol. 3 of 9, Trial Transcript, pp. 115-116 (Deputy William Stogner), 3/8/01; *see also*, *e.g.*, http://www.mapquest.com/.

[56]*See*, *e.g.*, http://www.mapquest.com/.

[57]St. Rec. Vol. 7 of 9, Trial Transcript, p. 12, 3/7/01; St. Rec. Vol. 3 of 9, Trial Transcript, p. 168, 3/8/01.

[58]St. Rec. Vol. 3 of 9, Trial Transcript, pp. 60-61, 3/8/01.

in El Paso, Texas, within the time frame already established by the other evidence and Vernon's own statement to police.

He has not demonstrated that counsel acted unreasonably in failing to further clarify how long it took Vernon to get from Louisiana to El Paso on December 5 and 6, where he left McCain for dead.[59]  Further, the record does not demonstrate that the timing of the drive was truly at issue in determining his guilt or innocence.  He has only argued that, without demonstrating how, the records would have altered the outcome of the trial.  This is not sufficient to support his claim.

For these reasons, he has failed to establish that counsel was ineffective in this regard under the standards set forth in *Strickland*.

### c & d.  <u>Failed to Obtain Motel Records and Receipts; Failed to Locate Eyewitnesses</u>

Vernon argues that counsel should have obtained motel records, receipts or eyewitnesses to establish that he and McCain were traveling voluntarily together.  He argues that this was crucial in proving his innocence, although he does not explain why or how.

Under a broad reading, Vernon may be suggesting that proof of her apparent voluntary presence would have diminished the State's kidnapping allegations, a possible element of the second degree murder charge.  The factual error in Vernon's claim here is that his own statement and testimony indicated that McCain was already in the trunk when he checked in to the motel.[60]

He has not demonstrated any reasonable basis for counsel to have searched out witnesses to determine whether anyone had seen McCain when their own client told police and testified at trial that McCain was already in the trunk before he stopped in El Paso.  Furthermore, he has not

---

[59]St. Rec. Vol. 3 of 9, Trial Transcript, p. 167, 3/8/01.

[60]St. Rec. Vol. 3 of 9, Trial Transcript, pp. 163-64, 166, 3/8/01.

established that but for this the outcome of the trial would have been different.  Vernon has not met either prong of the *Strickland* standard under this claim.

>    **e.**    **Failed to Investigate Relationship Between McCain and Vernon Jenkins**

Vernon alleges that McCain was having problems with her fiancé, Vernon Jenkins.  He claims that McCain told him that Jenkins took the money from K&S that night and that is why the surveillance tape was missing the last 45 minutes.  He claims that counsel erred in not investigating this line of defense.

Contrary to Vernon's allegations, his counsel in fact called inmate Marcus Kagler, who had been temporarily incarcerated with Vernon at the Washington Parish Jail.[61]  Kagler testified that he knew McCain and "her husband" whose "**last** name" he indicated to be "Vernon."[62]  He claimed that he saw McCain's "husband" at the gas station right before she went missing.[63]  He testified that he was carrying a blue zip-up money bag and heading towards the bank at "about nine o'clock at night."[64]

On cross-examination, however, the prosecutor was able to challenge Kagler's recollection.  The prosecution established that Kagler was not sure of the date he saw the man with the bank bag, that he identified the wrong gas station location, and that there was no bank across from the K&S where McCain worked.[65]  Obviously, the jury did not find Kagler's testimony to be credible.

---

[61]St. Rec. Vol. 3 of 9, Trial Transcript, p. 126, 3/8/01.

[62]*Id*., pp. 128-29.

[63]*Id*., p. 130.

[64]*Id*., pp. 130-31.

[65]*Id*., pp. 135-36.

26

Nevertheless, Vernon has not established what else counsel reasonably should have done to investigate the allegations learned in jail from Kagler three years after the murder.  As noted above, the allegations do not establish that the verdict would have been any different if counsel had further developed or pursued this defense.  Vernon has failed to establish either prong of the *Strickland* standard under this claim.

### f.      Failed to Investigate Other Evidence Found at the Crime Scene

Vernon alleges that there were several items, including a comb, a hat, and a lottery ticket, found at the crime scene that were never tested or investigated to determine if someone else was at the scene who could have corroborated his version of the events.

His speculation as to the value of these items hardly arises to the level of a basis to find counsel was deficient in his performance at trial.  Vernon himself testified that no one was around when he ran into McCain at the gas station after closing time.

Furthermore, Vernon had told officers that he lost his hat in the struggle with McCain.  Had counsel tested and introduced the hat, this may have been inculpatory and confirmed the statement Vernon later denied making.  "Failure to present [evidence does] not constitute 'deficient' performance within the meaning of Strickland  if [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise."  *Williams v. Cain*, 125 F.3d 269, 278 (5th Cir.1997).  Based on the circumstances of the case, it was not unreasonable for counsel to avoid use of the incidental evidence found at the crime scene.

In addition, as the State points out, the defense apparently hired a DNA expert for guidance on how to question the State's witnesses about the DNA evidence.[66] Her letter, attached to Vernon's petition, does not mention a need to test or question the failure to test the other evidence referenced by Vernon.[67]  On that advice, it was reasonable for counsel not to pursue testing as suggested by Vernon.

Vernon again presents nothing but speculation as to the value of the items found at the crime scene, one of which may very well have been the hat that would link him to the scene and confirm his struggle with McCain.  He has not pointed to a deficiency in counsel's performance or a prejudice resulting from counsel's actions.

**g.**       **Failed to Investigate the Weather on the Night of the Crime**

Vernon argues that counsel should have investigated the weather on the night of the crime to support an argument that the integrity of the evidence may have been compromised.  He claims that the weather would have effected the officers' ability to mark and photograph the knife found in the parking lot.  He further claims that it would have contaminated the knife for testing purposes.

The Court again is unable to discern the exact claim raised by Vernon.  He concedes in his own argument that the trial testimony confirmed that it rained off and on during the night of the investigation.  A reading of the transcript reflects that the officers testified that, after they suspected foul play, they reconstructed the crime scene and replaced the knife for pictures and measurements.[68] The officers confirmed that it drizzled or rained during the night throughout the investigation until

---

[66]Rec. Doc. No. 1-4, pp. 50-51.

[67]*Id.*

[68]*See, e.g.*, St. Rec. Vol. 6 of 9, Trial Transcript, pp. 74, 76-77, 82 (Officer Bott), pp. 99, 100, 104, 118-119 (Sergeant Jones), 3/6/01.

28

it finally stopped in the morning.[69]  In fact Sergeant Billy Jones testified that he secured the knife in the cardboard sheath in his trunk to prevent the possibility that the rain would contaminate the evidence if it turned out to be important to the investigation.[70]

No one testified that the rain impacted the investigation in any other way.  Defense counsel instead focused on the questionable contamination caused by the chain of possession of the knife. He specifically addressed the possibility of degradation and contamination with the State's DNA expert from the FBI.[71]

The record does not demonstrate that the rain played a role in the recovery of evidence or the quality of the evidence to have triggered counsel to act differently.  In addition, no such question was raised by the defense's consulting DNA expert.[72]  In light of these circumstances, Vernon has not demonstrated that counsel's performance fell below the standard of reasonableness or that his decision not to further question the weather was outside the reasonable parameters of trial strategy. "A conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999).  Vernon has not shown such an effect.  He has not made a showing under either prong of *Strickland*.

---

[69]St. Rec. Vol. 6 of 9, Trial Transcript, p. 76 (Officer Bott), p. 102-103, 117, 118-119 (Sergeant Jones), 3/6/01; St. Rec. Vol. 3 of 9, Trial Transcript, p. 76 (Deputy Michael Varnado), 3/8/01.

[70]St. Rec. Vol. 6 of 9, Trial Transcript, pp. 117, 118-119, 3/6/01.

[71]St. Rec. Vol. 3 of 9, Trial Transcript (continued), pp. 153-154 (Agent Callaghan), 3/7/01.

[72]Rec. Doc. No. 1-4, pp. 50-51.

### h.      Failed to Investigate the Relationship Between Vernon and McCain

Vernon claims that counsel was ineffective for failure to further investigate his relationship with McCain.  He claims that counsel could have established that he and McCain were friends leading to the probability that they left Franklinton together voluntarily and not because of a kidnapping.

Vernon again fails to indicate who would have provided this information or how any further information about their relationship would have altered the verdict.  The jury already had before it testimony that McCain and Vernon knew each other.  Vernon's sister, Cheryl Warren, testified that McCain was nice to Vernon and helped him with his gas bill at the station.[73]  In his statement to police, Vernon also indicated that McCain knew him, so he put her in the trunk so she would not identify him to anyone.  In addition, Vernon also testified at trial that they were friends.  She helped him with his gas bill and that they talked about her personal problems all the way to El Paso.  The jury obviously did not find his testimony to be credible, especially in light of the overwhelming evidence of his guilt.

Vernon has not shown that counsel was unreasonable in failing to present even more information about his relationship with McCain or that doing so would have altered the outcome of the case.  He has failed to meet either prong of the *Strickland* test.

### 2.      Failed to Hire an Expert in DNA Technology

Vernon alleges that counsel should have hired a DNA expert to test the victim's fingernail clippings to determine whether the victim struggled with him.  He contends that, although the defense's DNA consultant questioned why this was not done, counsel was remiss in failing to pursue

---

[73]St. Rec. Vol. 7 of 9, Trial Transcript, pp. 35-36, 39, 3/7/01.

it.  He also claims that counsel should have had the blood on the knife retested to dispute the statistical data from the State's DNA expert.

As noted previously, counsel's strategic choices do not form the basis for an ineffective assistance of counsel claim.  *Kitchens*, 190 F.3d at 701.  Since Vernon had already confessed to having had a struggle with her, any further testing may have been just as likely to confirm the struggle.  The decision not to pursue further testing was within the range of sound trial strategy under the circumstances of the case.  Vernon has not established a deficiency in counsel's performance.

With regard to retesting the blood on the knife handle, the exhibits provided by Vernon demonstrate that there was no remaining sampling to be tested after the FBI testing was completed.[74] Counsel would not have had a sample to submit to another expert or lab for testing.  Furthermore, counsel did have the FBI's test results analyzed by the consulting DNA expert mentioned previously.[75]

At trial, the State presented DNA testing results on the blood found on the handle of the knife located in the K&S parking lot near where McCain's car had been parked.  The test results conclusively excluded Vernon as a donor.[76]  The test results did not exclude McCain as a donor, and showed that among caucasians, the likelihood that she was the donor was one out of 690.[77]  As noted by the consulting defense DNA expert, this figure was not so discriminating as to conclude

---

[74]Rec. Doc. No. 1-4, pp. 50-51.

[75]*Id.*

[76]St. Rec. Vol. 7 of 9, Trial Transcript, p. 141, 3/7/01.

[77]St. Rec. Vol. 3 of 9, Trial Transcript (continued), p. 150, 3/7/01.

positively that McCain was the donor.[78]   Defense counsel used this information to attempt to

demonstrate that the blood sample on the handle of the knife could have belonged to at least nine

other caucasians living in Franklinton.[79]   Counsel used the available information to challenge the

testing results and the likelihood that the knife was involved in McCain's disappearance.   Vernon

has not demonstrated a deficiency in counsel's performance in this regard.

### 3.   Failed to Hire Forensic Pathology Expert to Investigate the Cause of Death and Whether There Was a Struggle

Vernon claims that counsel should have hired an expert to better establish that cause and time

of death in support of his continued argument that Louisiana was not a proper venue.   This Court

has already resolved that Washington Parish, Louisiana was a proper venue, leaving no merit to his

continued challenge to counsel's performance as it relates to that endeavor.   In other words, counsel

did not err in failing to do anything to establish where McCain took her last breath, since the law

is certain that under the circumstances of this case, Louisiana was a proper venue.   Having reached

that conclusion, counsel did not err in failing to hire an expert to pinpoint, if possible, where and

what time McCain took her last breath in the trunk of the car where Vernon admits he left her.

Vernon has not shown how any more particularized information on the time of death would have

altered the outcome of the case.

Furthermore, as with the fingernail clippings discussed above, counsel acted reasonably in

failing to retain an expert to examine whether a struggle occurred.   As noted above, the jury heard

Vernon's statement that he struggled with McCain to get her into the trunk.   Any further testing may

have been confirmed that the struggle had occurred.   The decision not to pursue that possible

---

[78]Rec. Doc. No. 1-4, pp. 50-51.

[79]*Id.*, p. 151-152.

conclusion, in light of Vernon's statement, was within the range of sound trial strategy under the circumstances of the case.

Vernon has failed to meet either prong of the *Strickland* test.  He is not entitled to relief on this claim.

### 4.   Failed to Challenge the Expertise of Dr. Juan Contin

Vernon claims that counsel was ineffective in failing to challenge Dr. Contin's credentials as an expert in forensic pathology.  He complains that he was accepted by the Court without the court making an independent assessment of his credentials in that area under *Daubert*.

In *Daubert*, the Supreme Court replaced the "general acceptance" standard of expert testimony with a standard that charges the trial court to act as "gatekeeper" ensuring the relevance and reliability of scientific expert testimony.  The question of whether an expert's testimony is reliable is ultimately a fact-specific inquiry.  *Butler v. Kitchens Brothers Mfg.*, 253 Fed. Appx. 395, 397-98 (5th Cir. 2007) (citing *Burleson v. Tex. Dept. of Crim. Justice*, 393 F.3d 577, 584 (5th Cir. 2004)).  A trial court enjoys wide latitude in determining the admissibility of expert testimony, and that decision is not to be disturbed absent a showing of manifest error.  *Id.*, at 398 (quoting *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997)).

A court's gatekeeping duties, however, are a "preliminary assessment."  *Daubert*, 509 U.S. at 592.  Once that testimony is admitted, it is for the jury to resolve the credibility and the reliability of the expert's testimony.  "'[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" (emphasis in original) *Primrose Operating Co. v. Natl.*

*American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United State v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

The trial transcript belies Vernon's suggesting that the trial court or counsel failed in the gatekeeping duties under *Daubert*.   The trial transcript includes a detailed presentation of Dr. Contin's background and training prior to his tender and acceptance as an expert.[80]   The trial transcript also includes a description of the detailed steps taken in the autopsy and in reaching Dr. Contin's conclusions as to the injuries and cause of death.[81]

Vernon does not suggest or point to any lack of training or sufficient background for him to have been accepted as an expert or for counsel to have challenged that acceptance.  He also does not point to any questionable methods or unsupported conclusions in the doctor's report or testimony to which counsel should have objected.

Counsel took advantage of the opportunity on cross-examination to question the doctor in great detail about the photographs, the testing and the alleged injuries, including the cause and timing of death.[82]  There is no basis in the record for counsel to have questioned the expertise of Dr. Contin as the medical examiner or his examination methods during the autopsy.   Without demonstrating a reason for counsel to have done so beyond that done at trial, his claim is insufficient to establish ineffective assistance under *Strickland*.

---

[80]St. Rec. Vol. 6 of 9, Trial Transcript, pp. 21-23, 3/6/01.

[81]*Id*., pp. 23-35, 44-49.

[82]*Id*., pp. 35-41.

**5.     Failed to Challenge the Expertise of Dr. Tom Callaghan**

Vernon next claims that his counsel was ineffective for failing to challenge the expertise of Thomas Callaghan as an expert.  This claim borders on the absurd in light of Vernon's repeated complaints that he was denied a copy of the transcript from the *Daubert* hearing at which defense counsel sought to exclude Callaghan and his test results from trial.

As discussed previously in this Report, the record reflects that the state trial court held a *Daubert* hearing at which Dr. Callaghan was accepted as an expert in the field of DNA analysis and methodology.[83]  The court's minutes reflect that the Court found that the four reliability factors in *Daubert* had been met, and indicated that the evidence was admissible at trial.[84]  In addition, the trial transcript included a detailed outline of Dr. Callaghan's background and training and the basis for and methods used to assess the DNA from the blood samples found on the knife and in the car.[85]

As resolved previously, Vernon has not pointed to anything in that transcript that would have raised a question as to the assessment made under *Daubert*.  His suggestion that counsel failed to challenge Callaghan and his test results is contrary to the facts and the record.  He has failed to establish either prong of the *Strickland* standard in this regard.

**6.     Told Prospective Jurors During Voir Dire That Counsel Was Court Appointed**

Vernon complains that his attorney erred in telling the voir dire panel that his counsel was appointed.  Vernon claims that this must have had an impact on the how the jury viewed him.  He

---

[83]St. Rec. Vol. 1 of 9, *Daubert* Hearing Minutes, 1/29/99.

[84]*Id.*

[85]St. Rec. Vol. 7 of 9, Trial Transcript, pp. 124-142, 3/7/11; St. Rec. Vol. 3 of 9, Trial Transcript (continued), pp. 143-150, 3/7/01.

claims that this may have caused the jury to look down on him and that there was no strategic reason to have mentioned it.

The record reflects that one of Vernon's attorneys, Kevin McNary, told the panelists during voir dire, that he and Bill Alford had been appointed to represent Vernon.[86]  The "[petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689.  It is settled in this circuit that counsel's actions during voir dire are considered to be a matter of trial strategy.  *Sterling v. Dretke*, 117 Fed. Appx. 328, 332 (5th Cir. Nov. 23, 2004) (citing *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995)); *Ray v. Johnson*, 196 F.3d 1257, 1999 WL 800173, at *1 (5th Cir. Sep. 20, 1999) (Table, Text in Westlaw).  Furthermore, the strategic mention of counsel's appointment may be used to suggest to the voir dire panel the financial limitations placed on the defense's ability to present its case.  *See Mattheson v. King*, 751 F.2d 1432, 1440 (5th Cir. 1985) (it was not outside of the wide range of professionally competent assistance for counsel to tell jury he was appointed to garner understanding for the absence of costly evidence).  Vernon has not presented any indication that counsel's actions fell outside of the realm of reasonable trial strategy.  He also has not established that the voir dire panel or any juror seated in his trial was detrimentally impacted by counsel's comment.  His conclusory speculation is not sufficient to meet the *Strickland* standard.  For these reasons, he is not entitled to relief on this claim.

### 7.   Failed to Challenge Improper Handling of the Knife and Crime Scene

Vernon alleges that his counsel failed to challenge the poor handling of the evidence, specifically the knife, and the crime scene at the K&S.  He alleges that his counsel failed to

---

[86]St. Rec. Vol. 5 of 9, Trial Transcript, p. 118, 3/5/01.

adequately address the mishandling of the knife or to raise contradictions in the reports and the testimony as to how the knife was handled and packaged.

Vernon's claim is wholly without factual support in the record. Even the most cursory review of the trial transcript reflects that defense counsel repeatedly raised issues with the identity of the knife, the faulty chain of custody, the handling and packaging of the knife, and the failure to secure the scene and other evidence at K&S. This effort can be seen in his thorough cross-examination of the investigating officers and the DNA expert from the FBI and in his argument to the Court.[87]

In fact, during Dr. Callaghan's testimony regarding the DNA testing results, defense counsel continually objected to any discussion related to the knife on the basis that a chain of custody had not been established by the State.[88] The fact that his objection was not successful does not mean counsel's performance was deficient. *See Martinez v. Dretke*, 99 Fed. Appx. 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").

The record reveals that his counsel did exactly what Vernon accuses them of failing to do. Vernon has not pointed to any deficiency in counsel's challenge to the handling of the knife and the crime scene. Vernon's claim is wholly without merit and does not demonstrate a violation of the *Strickland* standard. He is not entitled to relief on this claim.

---

[87]*See, e.g.*, St. Rec. Vol. 6 of 9, Trial Transcript, pp. 86-87, 88, 90, 91 (cross-examination of Officer Bott), pp. 111, 112-113 (cross-examination of Sergeant Jones), 3/6/01; St. Rec. Vol. 7 of 9, Trial Transcript (continued), pp. 148, 149 (cross-examination of Detective Maples), 3/6/01; St. Rec. Vol. 3 of 9, Trial Transcript (continued), pp. 152-154 (cross-examination of Thomas Callaghan), 3/7/01; St. Rec. Vol. 3 of 9, Trial Transcript, pp. 69-70, (cross-examination of Chief Lynn Armand), pp. 89-91, 101-102 (cross-examination of Deputy Michael Varnado), 3/8/01.

[88]St. Rec. Vol. 7 of 9, Trial Transcript, p. 142, 3/7/01; St. Rec. Vol. 3 of 9, Trial Transcript (continued), pp. 143-149, 3/7/01.

## VII.    Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Rondy Vernon, Sr.'s petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1430 (5th Cir. 1996).[89]

New Orleans, Louisiana, this 15th day of June, 2011.

**KAREN WELLS ROBY
UNITED STATES MAGISTRATE JUDGE**

---

[89]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

38